ARMSTRONG *v.* SECOND NAT. BANK OF SPRINGFIELD.

*(District Court, S. D. Ohio, W. D.* May 20, 1889.)

1. BANKS AND BANKING—NATIONAL BANKS—POWERS.
   Under Rev. St. U. S. § 5190, providing that "the usual business of each national banking association shall be transacted at an office or banking house located in the place specified in its organization certificate," a national bank cannot make a valid contract for the cashing of checks upon it, at a different place from that of its residence, through the agency of another bank.
2. SAME—CERTIFICATE OF AUTHORIZATION.
   Whatever the terms of such an arrangement, being made before the date of the drawee bank's certificate of authorization, it is invalid under Rev. St. U. S. § 5136, providing that no banking association "shall transact any business except such as is incidental and necessarily preliminary to its organization, until it has been authorized by the comptroller of the currency to commence the business of banking."

At Law. Action for money had and received.
*J. W. Wilby,* for plaintiff.
*J. Warren Keifer,* for defendant.

SAGE, J.   Plaintiff sues to recover for money had and received by, the defendant for his use, the sum of $3,841, being the proceeds of collections for account of the Fidelity National Bank with interest from June 21, 1887.   The defense is that on the 20th of June, 1887, at its banking house at Springfield, Ohio, the defendant, without knowledge or notice of the insolvency, or impending insolvency of the Fidelity National Bank, cashed for the Champion Bar & Knife Company, of Springfield, Ohio, its check on the Fidelity National Bank for $1,995, and at the same time and place cashed for the Champion Malleable Iron Company, also of Springfield, its check on the Fidelity National Bank for $1,846; the aggregate of the two checks being the sum sued for in this action, the drawers being depositors in the Fidelity National Bank, and each then having to its credit as such a sum at least equivalent to said check drawn by it in favor of the defendant   On the same day the defendant, in the usual course of business, indorsed said checks and forwarded them by mail to the Fidelity National Bank.   They were received at the bank on the morning of the 21st of June, but the bank being insolvent, it had that morning, before the receipt of the said checks, closed its doors, and passed into the possession of United States officials, duly authorized, who refused to credit the defendant the amount of said checks, as the plaintiff has since refused and still refuses to do.   It further appears in defense that on the 20th of June the defendant was indebted to the Fidelity National Bank on a collection account in a sum several thousand dollars in excess of the two checks above referred to, and that the defendant has paid over to the plaintiff the amount in its hands standing to the credit of the said Fidelity National Bank at the time it went into insolvency, that is to say, the entire amount of said collections, less the amount aforesaid of said two checks.   The further statement of the defense, as it appears in the answer, is—

"That, for a considerable period of time including the 20th day of June, 1887, there existed between the said two banks, by agreement, a mutual account as will appear by the books of each.   The defendant, in the usual course of business between the two banks, and as customary between such banks, and in pursuance of said agreement, made collections for and on account of the Fidelity National Bank, at its request, and from time to time, with its consent, placed the proceeds of such collections to the credit of the Fidelity National Bank on its books, and the defendant also, in the usual course of business between said two banks, and in pursuance of said agreement, and as customary between such banks, charged on its books, to the Fidelity National Bank, with its consent and against any credits on its books, any and all checks received and cashed by defendant, drawn by said two corporations and other parties, on said Fidelity National Bank, and the balances were settled between said national banks from time to time, interchangeably, whenever drawn on by the creditor bank, or by draft whenever the creditor bank so directed.   And the defendant avers that the two checks aforesaid were received, cashed, and credited in pursuance of the arrangement, agreement, and business custom aforesaid between said two banks, and in the due course of business between them."

The averments of the answer as to the arrangement and usual course of businsss and custom between the two banks are put in issue by the

reply. The certificate of authorization was issued to the Fidelity National Bank by the comptroller of the currency on the 27th of February, 1886, and the bank commenced business March 1, 1886. The directors and officers were elected February 9, 1886. Shortly after that date, and prior to the issuing of the certificate of authorization, Edward L. Harper, vice-president elect of the bank, made what is termed in the answer an agreement with the defendant bank by its president. It was a rather general arrangement and understanding to the effect that the defendant bank should keep an account with the Fidelity, that it should cash at its banking house at Springfield checks there presented by Fidelity depositors, resident at Springfield, and charge and have credit for them in account with the Fidelity, and that it should make collections for the Fidelity, and remit balances from time to time, substantially as set up in the answer. When the witness who testified to this arrangement was asked what was the stipulation or understanding with reference to any check cashed by the defendant, the drawer having either no balance to his credit in the Fidelity or a balance insufficient to meet the check, the answer was that no such case ever occurred; and so far as the testimony disclosed, no such case was provided for by the arrangement. After the Fidelity was authorized by the comptroller of the currency to commence the business of banking, no express arrangement was made, but the business was carried on between the two banks substantially in accordance with the understanding as testified to; that is to say, the defendant charged up checks to the Fidelity when it cashed them, and the Fidelity credited them when and as of the date it received them, no case arising which presented the question what should be done when a check had been cashed by the defendant for a depositor who had not funds in the Fidelity Bank sufficient to meet it.

The difficulties in the way of the defendant under its defense are to be found both in the facts and in the law. In the facts, inasmuch as upon the question which is vital to the defense, viz., Who should bear the loss if the defendant cashed a check for which there was not sufficient funds in the Fidelity? there is no stipulation or agreement. In the absence of a distinct understanding on this point, the charge against the Fidelity Bank and credit to itself by the defendant of the amount of the check cashed would be provisional merely, and subject to be corrected if the check was dishonored. The testimony relating to the custom between the banks was not sufficient to establish any rule or practice to the contrary. The difficulty in law is twofold. The last clause of section 5136, Rev. St. U. S., which relates to the corporate powers of banking associations, provides that "no association shall transact any business except such as is incidental and necessarily preliminary to its organization, until it has been authorized by the comptroller of the currency to commence the business of banking." From this provision it results that the arrangement, whatever it was, between Mr. Harper, as vice-president of the Fidelity Bank, and the defendant bank, made before the date of the certificate of authorization, has no force and cannot be taken into account.

If, now, we turn to section 5190, of the United States Revised Statutes, we find it enacted that "the usual business of each national banking association shall be transacted at an office or banking house located in the place specified in its organization certificate." Under this section it certainly would not be competent for a national bank to provide for the cashing of checks upon it at any other place than at its office or banking house. Whatever risk there was in the defendant's business of cashing of checks upon the Fidelity devolved, therefore, necessarily upon the defendant, and not upon the Fidelity. So far as the Fidelity was concerned, the checks were not cashed until they were presented and accepted at its banking house. They were not so presented until the morning of the 21st of June, after the bank had passed into the control of a government officer, and after insolvency of the bank had made it unlawful under section 5242, Rev. St., to either cash the checks on account of the defendant, or to give the defendant credit for them.

The questions which were argued with reference to the defendant's answer, treating it as a counter-claim, or regarding it in the nature of a counter-claim, are covered, in the opinion of the court, by *Armstrong* v. *Scott*, 36 Fed. Rep. 63.

The judgment will be for the plaintiff for the amount claimed, with interest.