Nonotuck Silk Co. vs. Flanders.

NONOTUCK SILK COMPANY, Respondent, vs. FLANDERS, Assignee, Appellant.

*February 23 — March 16, 1894.*

*Equity: Banks and banking: Voluntary assignment: Trust fund: Proceeds of draft collected: Priority of payment.*

One for whom a banker had collected a draft before making a voluntary assignment is not entitled to a preference over other creditors if the proceeds of such collection were disposed of by the banker prior to the assignment, so that no part thereof came in any form to the hands of the assignee. *McLeod v. Evans,* 66 Wis. 401, *Francis v. Evans,* 69 id. 115, and *Bowers v. Evans,* 71 id. 133, so far as they conflict herewith, overruled. ORTON, C. J., dissents.

| | |
|---|---|
| 87 | 237 |
| 87 | 385 |
| 87 | 237 |
| 88 | 368 |
| 87 | 237 |
| 89 | 366 |
| 89 | 388 |
| 87 | 237 |
| 90 | 480 |
| 90 | 633 |
| 87 | 237 |
| 91 | 59 |
| 91 | 102 |
| 87 | 237 |
| 103 | 568 |
| 104 | 90 |
| 87 | 237 |
| 111 | 366 |
| 111 | 367 |
| 87 | 237 |
| 57 LRA | 887 |
| 87 | 237 |
| 115 | 143 |

APPEAL from the Circuit Court for *Bayfield* County. For several years prior to June, 1893, the defendant's assignor, A. C. Probert, conducted a banking business at Washburn under the name of the Bank of Washburn. On May 24, 1893, the plaintiff, a corporation at Chicago, sent a draft for $99.67, on one Lemke, to the Bank of Washburn for collection. On June 2, 1893, the draft was presented to Lemke, and paid by his check on the Bank of Washburn on the same day. On June 3, 1893, the Bank of Washburn issued its draft on the Union National Bank, its Chicago correspondent, for the proper amount, and forwarded the same to the plaintiff. The plaintiff did not receive the draft until June 9, 1893, and deposited the same immediately in the First National Bank of Chicago. That bank presented the draft to the Union National Bank June 10, 1893, but payment thereof was refused. The Union National Bank then had no money to the credit of the Bank of Washburn, but did have collaterals, left there expressly to protect overdrafts, more than enough to protect the draft in question as well as all other drafts issued upon that bank by the Bank of Washburn.

On June 7, 1893, the Bank of Washburn closed its doors, Probert having failed. On June 26, 1893, Probert perfected an assignment for the benefit of his creditors, and on that day the defendant, his assignee, took possession of all his property, including the Bank of Washburn and its effects. Probert's assets at the time of such assignment amounted to $261,716.31, and his liabilities to $236,492.31. Such assets consisted of commercial paper, secured and unsecured, stocks, real estate, etc. No money whatever came into the hands of said assignee, except a few pennies and a $2.50 gold piece. All money in the Bank of Washburn on and after June 1, 1893, was used in paying checks drawn against deposits, and in paying clerk hire or employees of the Bank of Washburn. None of the moneys of Probert, and none of the proceeds of the collection made for the plaintiff, was used in acquiring other property or invested in other property of any kind; but all money in the possession of Probert at and after receiving said check of Lemke for the plaintiff was used in paying the debts of Probert, so that no money, or the proceeds of the money, in the Bank of Washburn, or the plaintiff's collection, or the proceeds of said collection, ever came into the hands of said assignee in the shape of property of any kind whatsoever.

On September 18, 1893, the plaintiff filed its claim against said estate. On October 17, 1893, the plaintiff procured an order to show cause why its said claim should not be declared preferred. On the final hearing of that application, December 6, 1893, it was ordered by the court that said claim be declared a preferred claim, and the money and effects upon which the same was founded were thereby declared to be trust funds, and the said assignee was thereby ordered to pay said claim of $99.42, in full, out of any moneys in his hands belonging to said estate, in preference to all claims against said estate not preferred, together with

costs and disbursements of such hearing, taxed at $25. From that order the defendant appeals.

For the appellant there was a brief by *Lamoreux, Gleason, Shea & Wright,* and oral argument by *E. F. Gleason.*

For the respondent there was a brief by *Warden & Alvord,* and oral argument by *E. C. Alvord.* They cited *McLeod v. Evans,* 66 Wis. 401; *Francis v. Evans,* 69 id. 115; *Bowers v. Evans,* 71 id. 133; *Independent Dist. of Boyer v. King,* 80 Iowa, 497; *Stroller v. Coates,* 88 Mo. 514; *First Nat. Bank v. Hummel,* 14 Colo. 259; *Myers v. Board of Education,* 51 Kan. 87; *San Diego Co. v. California Nat. Bank,* 52 Fed. Rep. 59.

CASSODAY, J. The amount involved is small, but the case is important by reason of others dependent upon it, and the nature of the question involved. It appears that A. C. Probert was the sole owner of the Bank of Washburn; that June 7, 1893, he failed, and his bank closed its doors; that June 26, 1893, he made a voluntary assignment of all his property to the defendant for the benefit of his creditors. There is some force in the suggestion that the receiving of Lemke's check in payment of the plaintiff's draft on him, held by Probert's bank for collection, and the sending to the plaintiff of a draft made by Probert's bank on the Chicago bank for the amount of such collection, four days prior to such failure, was nothing more than the substitution on the books of Probert's bank of a credit to the plaintiff, or to the Chicago bank, for the amount, in lieu of the former credit for the same amount to Lemke. But it appears that at the time of giving the check Lemke had funds in Probert's bank to the amount of the check, and hence the transaction would seem to be substantially the same as though Lemke had actually drawn the money on the check, and then immediately handed the same back in payment of the draft on him in favor of the plaintiff, and

then held by Probert's bank for collection; and that Probert's bank then retained the money so paid in by Lemke, and in lieu thereof sent to the plaintiff its draft on the Chicago bank, as mentioned in the foregoing statement. As therein indicated, the money so represented by the check was, with other moneys, used up in paying the debts of Probert, so that no part of that money or the proceeds of that collection, either in the shape of money or of property of any kind, ever came into the hands of the defendant as such assignee. Such being the facts, it is manifest that the plaintiff is not here reclaiming his own property intrusted to Probert's bank, nor the avails or the proceeds thereof, but is here claiming a preference over other creditors out of other assets and property of Probert received by the defendant by virtue of such assignment. Certainly, there is no statute in this state giving any such preference, nor any authorizing an insolvent debtor, by way of a voluntary assignment, to give such preference. Laws of 1883, ch. 349; Laws of 1885, ch. 48; secs. 1693a, 1693c, S. & B. Ann. Stats. It follows that, if the plaintiff is entitled to such preference at all, it must be by virtue of some established principle of equity or the common law.

The early English cases only went to the extent of holding, in effect, that the owner of property intrusted to an agent, factor, bailee, or other trustee could follow and retake his property from the possession of such trustee or others in privity with him and not a *bona fide* purchaser for value, whether such property remained in its original form or in some different or substituted form, so long as it could be ascertained to be the same property or the product or proceeds thereof, but that such right ceased when the means of ascertainment failed, as when the subject of the trust was money, or had been converted into money and then mixed and confounded in a general mass of money of the same description, so as to be no longer divisible or

distinguishable. This is apparent from the opinion of Lord ELLENBOROUGH, C. J., written nearly eighty years ago, reviewing the adjudications prior to that date. *Taylor v. Plumer*, 3 Maule & S. 575. But the more recent rule in England as to following trust moneys is broader, and goes to the extent of holding, in effect, that "if money held by a person in a fiduciary character, though not as trustee, has been paid by him to his account at his banker's, the person for whom he held the money can follow it, *and has a charge on the balance* in the banker's hands;" that "if a person who holds money as a trustee or in a fiduciary character pays it to his account at his banker's, and mixes it with his own money, and afterwards draws out sums by checks in the ordinary manner, . . . the drawer must be taken to have drawn out his own money, in preference to the trust money." *In re Hallett's Estate* (*Knatchbull v. Hallett*), 13 Ch. Div. 696, overruling some former English cases. In that case there was no dispute but that the money received by the trustee for the property wrongfully converted was deposited with his bankers to the credit of his account, and that the same "remained at his banker's, mixed with his own money, at the time of his death." But in the leading opinion, by JESSEL, M. R., in that case, and by way of quoting Mr. Justice FRY approvingly, it is said: "The guiding principle is that a trustee cannot assert a title of his own to trust property. *If he destroys a trust fund by dissipating it altogether*, there remains nothing to be the subject of the trust. But so long as the trust property can be traced and followed into other property into which it has been converted, that remains subject to the trust." Id. p. 719. That case is as favorable to the claim of the plaintiff as any in the English courts; and yet it nowhere sanctions the proposition that the owner of the property or money intrusted is entitled to a preference over other creditors of an insolvent estate out of property or assets to which no

part of the trust fund or the proceeds thereof is traceable. All such cases turn upon the question of fact whether the trust property or fund, or the proceeds thereof, are traceable into any specific property or fund. *Ex parte Hardcastle (Re Mawson)*, 44 Law T. Rep. 524. Thus, in *In re Cavin v. Gleason*, 105 N. Y. 256, it was held that, "to entitle the trust creditor to such a preference, it must at least be made to appear that the fund or property of the insolvent, remaining for distribution, includes proceeds of the trust estate." To the same effect, *Atkinson v. Rochester P. Co.* 114 N. Y. 168; *Holmes v. Gilman*, 138 N. Y. 376.

In *Little v. Chadwick*, 151 Mass. 110, the court said: "When trust money becomes so mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property, the trust ceases. The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the *cestui que trust* to follow it *fails.*" To the same effect are *Goodell v. Buck*, 67 Me. 514; *Portland & H. S. Co. v. Locke*, 73 Me. 370; *Englar v. Offutt*, 70 Md. 78; *Thompson's Appeal*, 22 Pa. St. 16; *Columbian Bank's Estate*, 147 Pa. St. 440; *Appeal of Hopkins*, (Pa.) 9 Atl. Rep. 867; *Union Nat. Bank v. Goetz*, 138 Ill. 127; *Neely v. Rood*, 54 Mich. 134; *Sherwood v. Milford State Bank*, 94 Mich. 78; *Northern Dakota Elevator Co. v. Clark*, (N. D.) 53 N. W. Rep. 175; *National Bank v. Insurance Co.* 104 U. S. 54, 68; *Peters v. Bain*, 133 U. S. 670, 693; 2 Story, Eq. Jur. §§ 1258, 1259; 2 Pom. Eq. Jur. § 1058; 1 Lewin, Trusts (1st Am. ed.), 241. In speaking of following trust moneys into other property, it is stated in one of the New York cases cited that "the right has its basis in the right of property." It never was based upon the theory of preference by reason of an unlawful conversion. This is made clear by a recent and well-considered opinion by the supreme court of

Rhode Island.   *Slater v. Oriental Mills*, (R. I.) 27 Atl. Rep. 443.

It follows that the mere fact that Probert's bank used the plaintiff's money toward paying its indebtedness before making the assignment, did not authorize a preference to the plaintiff over Probert's other creditors out of his other property and assets.   This is made plain by an illustration having judicial sanction in the case last cited: " Suppose that an insolvent debtor, D., has only $1,000 of property, but is indebted to the amount of $2,000, one half of which is due to A. and the other half to B.   In this condition of things, D.'s property can only pay fifty per cent. of his debts.   By such distribution, A. and B. would each be equitably entitled to $500.   Now suppose D., while in that condition, collects $1,000 for F., but instead of remitting the money as he should he used it in paying his debt in full to A.   By so doing, D. has not increased his assets a penny, nor diminished his aggregate indebtedness a penny.   The only difference is that he now owes $1,000 each to B. and F., whereas he previously owed $1,000 each to A. and B.   Now, if F. is to have preference over B., then his claim will absorb the entire amount of D.'s property, leaving nothing whatever for B.   In other words, the $500 to which B. was equitably entitled from his insolvent debtor upon a fair distribution of the estate has, without any fault of his, been paid to another, merely in consequence of the wrongful act of the debtor."   *Slater v. Oriental Mills, supra,* and dissenting opinion in *Francis v. Evans,* 69 Wis. 123.   See, also, *McClure v. Board of Comm'rs,* 34 Pac. Rep. 763.   We must hold that the plaintiff has no legal right to a preference over Probert's other creditors in the distribution of his estate in the hands of the defendant as assignee, and into which no part of the plaintiff's money has been traced.

This is not a mere question of practice nor the construc-

Nonotuck Silk Co. vs. Flanders.

tion of a local statute long acquiesced in, but is a question of general equity jurisprudence; and it is very important to the people of the state that this court should, at least on such questions, adhere to the principles of the common law so well established as to become elementary. It is especially essential that the state and federal courts on such questions should be in harmony. In so far as *McLeod v. Evans*, 66 Wis. 401, *Francis v. Evans*, 69 Wis. 115, and *Bowers v. Evans*, 71 Wis. 133, are in conflict with the rules above indicated, they must be regarded as overruled.

*By the Court.*— The order of the circuit court is reversed, and the cause is remanded for further proceedings in accordance with this opinion.

ORTON, C. J.   This case is ruled by *McLeod v. Evans*, 66 Wis. 401; *Francis v. Evans*, 69 Wis. 115; and *Bowers v. Evans*, 71 Wis. 133. It was a case of a special deposit or trust or agency. It was the employment of the bank to collect a draft. It ought not to make any difference that the bank embezzled the proceeds. The plaintiff was clearly entitled to be a preferred creditor. If this was the first case of the kind, I might not dissent.

I respectfully dissent on the ground that the decision in this case overrules three well-considered and reconsidered decisions of this court. In the long history of this court there have been very few overruled cases. The interests of the public are best subserved by the *stability* of decisions. If former cases are to be overruled by every change of the personality of the bench, we may soon have no line of decisions on important questions to which the business of the country has been long adapted and adjusted, and everything will become unsettled.