STEPHEN BRADLEY, Administrator with Will Annexed of the ESTATE of J. C. HORMEL, Appellant, v. C. E. CHESEBROUGH AND J. L. GIESLER, Assignees of A. A. BALL & Co., Appellees.

**Banks:** INSOLVENCY:    *Trust funds.*    An executor deposited some $3,000 of funds belonging to his estate with a bank in which he was a partner. The assets of the bank were, for a time after the deposit, largely augmented, to which deposits, generally, including this one, contributed. No new loans were made after this deposit, with bank funds, and, after a time, deposits shrank and losses were incurred on overdrafts, largely exceeding said $3,000 deposit. The bank failed and the assignees received private property of the bankers, some $450 in cash, said overdraft and bills receivable, largely uncollectable, which were obtained before said deposit was made. *Held,* though there is a presumption that funds received by a bank better its assets, the presumption is rebutted here and that it does not appear the deposit had been preserved and came to the assignees in such form that it can be treated as a preferred trust without

injury to the rights of general creditors.  *Plow Co. v. Lamp,* 80 Iowa, 722, distinguished and criticised.

**Evidence:** EXTRACTS FROM BANK BOOKS.  In an action against the assignees of a bank to impress a trust on funds in their posses- sion, one of the assignees who was bookkeeper of the bank may, in testimony, give statements made up from the books of the bank showing the assets and liabilities and the disposition thereof, when the books from which the statements were taken were present in court, and were not offered in evidence, there being ample opportunity to examine them and to cross examine the witness.

*Appeal from Muscatine District Court.*—HON. W. F. BRAN- NAN, Judge.

SATURDAY, APRIL 14, 1900.

SUIT in equity to impress a trust on certain funds in the hands of the defendants, as assignees of a banking part- nership known as A. A. Ball & Co., and for judgment for the amount of plaintiff's claim.   The trial court. denied the relief asked, and plaintiff appeals.—*Affirmed.*

*Remley, Ney & Remley* for appellant.

*Jayne & Hoffman* and *Carskaddan & Burk* for ap- pellees.

DEEMER, J.—From an opinion filed by the learned trial judge we extract the.follow statement of facts, that we find sustained by the record:  "John C. Hormel, the decedent, it appears, died intestate on or about the nineteenth day of April, 1892.   He was at the time of his death a resident of Johnson county, Iowa, and A. A. Ball, of the firm of A. A. Ball & Co., bankers at West Liberty, and the active business manager of said firm, was, by the last will of said testator, appointed executor.   He accepted the trust, and duly qualified as such executor.   The fund which it appears came into his hands, as such executor, was . deposited by the executor in the bank of the said A. A. Ball

& Co., and amounted, up to the first of February, 1893, to
the sum of three thousand two hundred and eighty-six dol-
lars and seventy-six cents. The defendants claim that at that
date the money thus deposited had been paid out in the
ordinary course of business by the bank. The balance re-
maining in the bank to the credit of the estate, according to
its books, on the nineteenth of September, 1896, amounted
to the sum of three thousand two hundred and eighty-six dol-
lars and seventy-six cents. At the last date it appears that
the said firm of A. A. Ball & Co. and its individual members
made a general assignment for the benefit of creditors. On
the seventh of April, 1897, some months after the assign-
ment, Mr. Ball was by the court removed from his office as
executor of said estate, and the plaintiff appointed admin-
istrator with the will annexed. On the twenty-sixth day of
the same month the plaintiff, as administrator aforesaid,
instituted the present proceeding, claiming that, with interest
at six per cent., there was due the sum of four thousand
two hundred and twenty-one dollars and eighty-nine cents at
the time the petition was filed. He alleges that Ball, as
executor of said estate, deposited the same sum received by
him on account of said estate with the banking firm of A. A.
Ball & Co., to the credit of said J. C. Hormel estate, who
used the moneys as received in the banking business as their
own money, subject only to be drawn from said A. A. Ball &
Co. on proper order of court; that the money so received
by said Ball, as executor, deposited with the said banking
firm, increased, bettered, and improved said estate therewith,
and turned over all of said estate so bettered and improved
thereby, under their deed of general assignment for the
benefit of creditors, to the said Chesebrough and Giesler,
who hold the same in their hands under said assignment.
The plaintiff further alleges that said A. A. Ball & Co. had
actual knowledge of the fact that the money deposited to the
credit of the John C. Hormel estate was trust money in the
hands of Ball, as executor, and formed a trust fund in the

hands of A. A. Ball & Co., and that with this knowledge Ball & Co. wrongfully converted to their own use money which it was their duty to preserve. The defendants, in answer to the claim of the plaintiff, in substance say that no part of the money thus deposited came into their hands under the deed of assignment, and that none of it exists in any other form in the assets that they received as assignees. There is no dispute as to the fact that the money belonging to the Hormel estate was by A. A. Ball, the executor of said estate, deposited in the bank of A. A. Ball & Co., and by it wrongfully used in the course of its business. The real question, then, is this: Was the said fund or some part of it preserved in some form by the said insolvent banking firm at the date of the assignment? The cash in the bank at that date, that appears to have come into the hands of the assignees, was but a few cents less than four hundred and fifty dollars. There was a very large amount of notes, but these notes represented loans that were improvidently made, and at the date of the assignment were some of them worthless, and others of but little value. The notes on hand, good and bad, and which were delivered to the assignees, amounted in all to the sum of two hundred forty-five thousand eight hundred and one dollars. At the time the case was submitted to the court the gross collections on notes was eighty-seven thousand five hundred and seventy-two dollars, and setoffs allowed against them was seven thousand four hundred and seven dollars and ninety-two cents, leaving as the net amount received by the assignees the sum of eighty thousand ninety-three dollars and forty-eight cents."

In addition thereto, it may be stated that after the receipt of the money, and down to May, 1893, there was a steady increase in the assets of the bank. About the last-named date the historic panic of 1893 came on, and the assets of the bank gradually and surely decreased, until the

bank was forced to make an assignment for the benefit of its creditors. It also appears that at the time the deposit was made which plaintiff seeks to recover there was due from the bank to depositors two hundred ninety-six thousand and seventy-seven dollars and seventy-seven cents. When the assignment was made this amount had been reduced to one hundred eighty thousand six hundred and ten dollars and twenty-five cents. After the beginning of the year 1893, the bank made no new loans, except from money borrowed from other banks. One of the assignees, who was also one of the employes and a bookkeeper of the bank, testified that none of the assets acquired by the bank after June 1, 1893, came into the hands of the assignees, save such as were procured with money borrowed as above stated. This same witness also testified that the bank received notes after the date of the deposit and before the assignment, to the amount of nearly one hundred and eight thousand dollars, that were uncollectible, and he also testified that during the same time the bank allowed overdrafts to the amount of ten thousand five hundred and ninety-three dollars that cannot be collected. During this same period the bank was paying interest on time certificates at the rate of five per cent. The amount of these certificates was something like one hundred and forty-eight thousand dollars. It was also paying the ordinary current running expenses. The same witness to whom we have referred further testified that he was unable to tell, either from memory or from the books of the bank, where the money belonging to the Hormel estate was invested; that it was so mixed with other funds that he was unable to tell where it is, or what debt was paid with it; and that "it may have been invested in notes that we have in our hands as assignees, or it may have been paid out in cash in the general manner of carrying out the business." The claims filed against the assignees amounted to nearly two hundred and forty thousand dollars. Some of the items to which we have referred are gathered from statements made by the witness

hitherto mentioned, who was a bookkeeper in the bank, made up from books of the bank. The books from which they were taken were produced at the trial, but were not offered in evidence, as we understand it. If they were offered they are not included in the abstracts, and have not been sent to this court.

. Plaintiff objects to the statements on various grounds, but we think they were properly admitted in evidence, and should be considered on this appeal. *State v. Cadwell,* 79 Iowa, 432; *Casey v. Banking Co.,* 98 Iowa, 107; *Von Sachs v. Kretz,* 72 N. Y. 548. The books were present in court, and plaintiff had ample time and opportunity to examine them, and to cross-examine the witness. The witness stated that the lists he presented were correct, and were taken from the books of the bank. He was an officer of the court, and had charge of the books, and was asked to make statements therefrom, and to state the condition of the assets. Such evidence was certainly competent. At the time the bank received the money belonging to the estate, it had cash on hand and with other banks amounting to about thirty-six thousand dollars, and it had in bills receivable about three hundred and twenty thousand dollars. Its total liabilities at that time were about three hundred and nineteen thousand dollars, not including its liability to the individual partners. During the time between July 1 and September 1, 1893, the deposit account was reduced more than thirty thousand dollars. At the time of the assignment the books showed that the bank had in cash and with other banks about three thousand eight hundred dollars, although as a matter of fact but about four hundred and fifty dollars in actual cash was turned over to the assignees. It had in bills receivable about two hundred and forty-five thousand dollars. Its deposits account had been reduced from about two hundred and ninety-six thousand dollars in February, 1893, to about one hundred and eighty thousand dollars at the time of the assignment. Its bills-pay-

able account, which was ten thousand dollars at the time it received the money of the estate of Hormel, amounted at the time of the assignment to twenty-two thousand five hundred dollars. But its indebtedness to other banks was a little larger in 1893 than in 1896. It paid out for interest during this time about twenty-one thousand dollars, and the amount of uncollectible notes it had at the time of the assignment has already been stated. There is an apparent discrepancy in the evidence regarding the amount collected by the assignees. The trial court found it amounted to something over eighty thousand dollars, but this, no doubt, refers to the amount collected on notes; for both the assignees admit that they have collected something over one hundred and thirty-eight thousand dollars. About seventeen thousand dollars of this last-named amount was collected on the overdraft account, which amounted to about thirty-seven thousand dollars at the time of the assignment. One of the members of the banking firm turned over his individual property to the assignees, and quite an amount of money was collected therefrom. The assignees have already declared a dividend of fifty per cent. to the general creditors, besides paying a preferred claim amounting to over six thousand one hundred dollars, and they say they will be able to pay another dividend of fifteen per cent. The assignees received the bills receivable owned by the bank, the small amount of cash found in its drawers, and the property of the individual members of the banking firm.

These are as near the controlling facts as it is possible to gather them from the record. We have so recently considered the law applicable to such facts that it is unnecessary to do more than refer to a few more important cases. In _Jones v. Chesebrough,_ 105 Iowa, 303, which involved the same bank as the case at bar, we said that, "where trust money has been received, it is not material whether it is preserved in the form of money or other property, but it must appear, by presumption or otherwise, that it has been

preserved in the hands of the assignee as an increase of assets in his hands which may be taken without impairment to the rights of creditors." There, as here, it appeared that the bank made no new loans, nor acquired any kind of property with money belonging to plaintiff's estate, unless it be in the overdraft account. It also appeared that from the time of the receipt of the plaintiff's money, down to the time of the assignment, the amount paid out to depositors largely exceeded the amount received from them. The evidence in this case shows from some time in 1893, down to the making of the assignment, the same state of facts. There as here, the money plaintiff sought to recover was mingled with other money of the bank, and used by it in the usual and ordinary course of banking and in the payment of its debts. In view of this state of the record, we may with propriety quote again from that case: "While the payment of debts in that manner by a trust fund lessens the indebtedness of an insolvent estate, and may thereby increase the percentage of dividends declared from other funds, it does not follow that the assignee has any increase of assets because of it. It may follow that he has less debts to pay, and the estate is in that way benefited. But such a benefit to creditors is but partial, and, if such a payment is to serve as a reason for withdrawing an equal amount from the assignee, the result is an absolute loss for the creditors."

On behalf of plaintiff it is contended, however, that for a time after the deposit of the money of the estate the bank was in a prosperous condition, and was increasing its assets, that its financial troubles began with the panic of 1893; and that we should presume that the money in question was used in such a manner as to increase its assets. If that were the only showing in the case, there would be much force in plaintiff's contention. Although, if there is any presumption in the case, we suppose it ought to be that Ball, as executor, would not invest money belonging to the estate he represented without an order of court,

and that, if he loaned the money, he would take the invest-
ment made to represent it, not in the name of the bank, but
in his own name, as executor. The primary question, how-
ever, is not whether the assets of the bank may have at one
time been increased by this deposit. That result follows
when any deposit is made. But was there an increase in the
assets that came into the hands of the assignee? These
assets we have already mentioned, and it is clear that the
deposit did not increase the property or fund received by
them from the individual members of the banking firm. It
could not have gone into notes executed prior to the time it
was received, and the evidence shows beyond question
that no loans, other than renewals, were made by the bank
after the deposit of the money belonging to the estate that
plaintiff represents, except from money borrowed of other
banks. Plaintiff's money is therefore not in the bills re-
ceivable. But, if it were there, the loss on this item of more
than one hundred and seven thousand dollars makes the
rule announced in *Jewell v. Clay,* 107 Iowa, 56, to which
we will hereafter more particularly refer, apply.

If any fund in the hands of the assignees has been in-
creased, it must be the overdraft account. There was a loss
on this account of more than ten thousand dollars. How-
ever, a trust fund amounting to about six thousand two hun-
dred dollars was allowed, which must have been taken from
the amount received on overdrafts, as there is no other fund
from which it could rightfully be taken.

Again, during the period between the deposit and the
assignment the bank paid out about twenty thousand dollars
in interest, besides the usual and ordinary expenses of the
bank. Moreover, at the time the funds of the bank were
being augmented, deposits were made by other people, and
there is no means by which it may be told what, if any, of
the deposits made for the estate went into this overdraft
account. If it was augmented, the losses and payments to
which we have referred have certainly exhausted all that

went to the assignees. The same thought applies with equal force to the cash found in the bank when the assignees went into possession.

Again, it appears that between a time shortly after the deposit that plaintiff seeks to recover was made and the failure of the bank, there was withdrawn from the bank by other depositors more than one hundred thousand dollars. As said in the *Jewell-Clay Case, supra* "In view of this evidence, it cannot be presumed that the property in which the loan (deposit) was invested was and continued to be of the full value of the loan, and that it passed to the assignees, and that the depreciation and loss were wholly in other property." In that case the firm was solvent when the money was received, but during the financial crisis of the year 1893 it became involved, and its assets decreased from one hundred to twelve per cent. None of the cases relied on by appellant, unless it be *Plow Co. v. Lamp,* 80 Iowa, 722, are in conflict with our conclusions. In *Independent Dist. of Boyer v. King,* 80 Iowa, 500, there was no showing as to what the assets were in the hands of the assignees, nor from what funds they had been derived. The case turned wholly on presumptions. It is there said: "It will be presumed, in the absence of a showing to the contrary, that it [the money] was preserved by them [the bank] in some form, and that it passed into the hands of their assignee." In *Nurse v. Satterlee,* 81 Iowa, 495, the money deposited was traced directly into a fund held by another bank. In *District Twp. of Eureka v. Farmers' Bank,* 88 Iowa, 194, the assignees and the creditors made a showing to the effect that certain real property held by the bank was acquired before plaintiff made its deposit, and this property was held not liable to be impressed with a trust. The assignees' contention was that a considerable amount of property transferred to him was not in any manner augmented by the plaintiff's deposit. He made no showing as to the other assets in his hands, and, after holding that no trust should be impressed

on the real estate, we said: "The burden was upon the assignees to show that it [the deposit] contributed nothing to the estate which they acquired by virtue of the assignment." To the extent that they had met that burden, we held the estate not liable. *In re Knapp,* 101 Iowa, 488, there was no showing whatever by the assignees as to the assets in his hands, or as to how these assets were accumulated. As already intimated, there are some things said in the *Davenport Plow Company Case* that seem to run counter to the rules herein announced; but in that case there was no showing by the assignee as to the assets received by him, or as to when or how they were acquired by his assignor. That part of the opinion on which plaintiff relies is purely dictum, and was disapproved in *Jones v. Chesebrough, supra.* In the case at bar it is shown that no part of the deposit plaintiff seeks to recover went into the bills receivable, and that if it did, there has been such a large shrinkage therein as that they cannot be said to have been augmented thereby; that, while some of it may have gone into the overdraft account, that account has been so diminished, and was of such a character, that plaintiff should not be allowed to profit therefrom at the expense of general creditors. Whatever presumption might have obtained in the absence of proof has been rebutted, or, at least, such a showing has been made as to render it entirely probable that much, if not all, of the deposit was lost. That plaintiff was a trust creditor does not of itself, entitle him to preference over general creditors. To obtain that right he must show, by presumption of law or otherwise, that his fund has been preserved in the hands of the assignee, as an increase of the assets of the estate, from which it may be taken without impairment of the rights of general creditors. *Cavin v. Gleason,* 105 N. Y. 262 (11 N. E. Rep. 504); *State v. Bank of Commerce,* 54 Neb. 725 (75 N. W. Rep. 28); *Jones v. Chesebrough, supra.* As sustaining our conclusions, see, also, *Insurance Co. v. Caldwell,* 59 Kan. 156 (52 Pac. Rep. 441); *In re Irish-*

*American Bank,* 70 Minn. 238 (73 N. W. Rep. 7); *Hubbard v. Manufacturing Co.* 53 Kan. 637 (37 Pac. Rep. 626). It may be observed, in closing, that *McLeod v. Evans,* 66 Wis. 401 (28 N. W. Rep. 123, 214), on which the dictum found in the *Plow Co. Case* was based, was overruled in *Silk Co. v. Flanders,* 87 Wis. 237 (58 N. W. Rep. 383). Our conclusion is that the decree is right, and it is AFFIRMED.