In re LARKIN & METCALF et al.

(District Court, D. South Dakota, Northern Division. December 9, 1912.)

No. 711.

1. BANKRUPTCY (§ 140*)—PERSONAL PROPERTY—SALE ON COMMISSION.
    Where claimant sent certain flour to the bankrupts and their representative before bankruptcy for sale on commission, there being no promise by the bankrupts to pay for the flour or any personal responsibility therefor, the flour at all times before sale and the proceeds thereof after sale remained the property of the claimants.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 198, 199, 219, 221, 225; Dec. Dig. § 140.*]

2. TRUSTS (§ 358*)—PROPERTY MISAPPROPRIATED—FOLLOWING TRUST FUNDS.
    Money misappropriated may be recovered as a trust fund from any one not an innocent purchaser in any shape into which it may have been transmuted, provided complainant can establish the fact that it is his property or the proceeds of his property, or that his property has gone into it, and remains in a mass from which it cannot be distinguished.
    [Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 523, 553; Dec. Dig. § 358.*]

3. BANKRUPTCY (§ 345*)—PREFERRED CLAIMS—TRUST FUNDS—MISAPPROPRIATION.
    The proceeds of flour shipped to the bankrupts for sale on commission could not be followed and recovered as a preferred claim against the bankrupts' estate, where such proceeds were entirely used in paying claims of the bankrupt, and in conducting the bankrupts' business before adjudication, and no part thereof came into the hands of the bankrupts' trustee, either in money or other property.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 531, 532, 534, 539, 540; Dec. Dig. § 345.*]

In Bankruptcy. In the matter of bankruptcy proceedings of Larkin & Metcalf. Petition by the representatives in bankruptcy of the Hubbard Milling Company for a preferred claim against the estate of the bankrupts for the proceeds of certain flour shipped to the bankrupts and their representative for sale on commission. On petition to review an order denying the claim. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Taubman & Williamson, of Aberdeen, S. D., for petitioning creditors.

C. O. Newcomb, of Aberdeen, S. D., for bankrupt.

ELLIOTT, District Judge. On November 1, 1911, an involuntary petition in bankruptcy was filed against the bankrupts above named, and they were adjudged bankrupts December 5, 1911, and thereafter E. J. Grover was duly appointed trustee in bankruptcy. On the 15th day of July, 1912, the Hubbard Milling Company, a corporation, of Mankato, Minn., filed its petition in the bankruptcy proceedings, representing, in substance, that prior to the instituting of the bankruptcy proceedings herein, the bankrupts and their representative E. J. Grover, and others, had in their possession the sum of $1,567.40 from the sale of two car loads of flour, which flour was claimed by the petitioners to have been consigned to said bankrupts. It further appeared in said petition that petitioners claimed that the bankrupts and said E. J. Grover and others received said flour from the petitioners under and by virtue of a verbal contract entered into by and between the said bankrupts and the petitioners, whereby the bankrupts were to handle certain brands of flour therein referred to, manufactured by petitioners, at their places of business in South Dakota on consignment. In said petition it further appears from the claim of said petitioners that said flour in the aggregate amounted to 629 sacks, consigned to the bankrupts under the terms of said oral agreement, which remained and was the property of the petitioners, and was held and possessed by said bankrupts as the agents of the petitioners as consigned property. It further appears from said petition that bankrupts were not concerned in disposing of said flour except as commission men, and as agents of petitioners, and that the same was disposed of as the property of the petitioners, and the bankrupts and their representatives collected all of the money belonging to the petitioners, the value of said flour, from the persons to whom it was delivered by them, as the agents of the petitioners, in the sum of $1,538.60. It is further alleged in said petition that this amount of money had been collected from the parties to whom the flour was delivered by the bankrupts and their agent, and that said money so arising from such sale belonged to petitioners, and at all times had belonged to them, and to no one else. It further appears from the petition that the said funds were, in fact, the property of the petitioners, were in the hands of the trustee, and did not belong to the trustee nor to the estate, and petitioners thereupon demanded the funds in said estate to whatever extent said funds had been derived from said flour so consigned to said bankrupts.

Upon the hearing upon the issue presented by this petition the referee made and filed an order, dated March 28, 1912, which order, omitting the title and formal portions, is as follows:

"The court finds that during the months of May and August, 1911, two car loads of flour were shipped to Larkin & Metcalf on consignment; that about July 12, 1911, through an arrangement made with the firm of Larkin & Metcalf and a portion of the creditors of said firm, E. J. Grover et al. were placed in charge of the business of the said firm; that a portion of said flour was sold by Larkin & Metcalf prior to this arrangement, and that

the balance of the said flour was sold after the 12th day of July, 1911; that at the time E. J. Grover et al. took charge as the trustees or agents of Larkin & Metcalf of the business of said firm there was no cash on hand, and that all of the proceeds from the sale of this flour, together with all other business done in conducting said business by said agents or trustees, up to and including the 1st day of November, 1911, was all used and paid out in the conducting and carrying on of said business; that on the 1st day of November, 1911, an involuntary petition was filed against said bankrupt firm, and that on the 5th day of December, 1911, the members of said firm were adjudicated bankrupts; that no part of the moneys received and now in the hands of the trustee of the above estate came from the proceeds of the sale of flour so shipped on consignment.

"It is therefore ordered that the application of the Hubbard Milling Company made herein for the payment of $1,538.60 from moneys in the hands of the trustee of the above-entitled estate be, and the same is hereby, disallowed, for the reason that it does not appear that any of the money from the sale of goods made under the contract for the handling and disposing of the flour shipped on consignment actually passed into the hands of the trustee of this bankrupt estate, or is held at this time by him."

Thereupon the petitioners filed a petition for review of said order, which is as follows:

"That such order was, and is erroneous, in that:

"(1) That there was no evidence to support said order in the following particulars: (a) There was no evidence to support the finding in said order 'that a portion of said flour was sold by Larkin & Metcalf prior to the appointment of E. J. Grover et al. to have charge of the business of the bankrupts.' (b) There was no evidence to support the findings in said order 'that at the time E. J. Grover et al. took charge as the trustees or agents of Larkin & Metcalf of the business of said firm there was no cash on hand, and that all of the proceeds from the sale of this flour, together with all other business done in conducting said business by said agents or trustees up to and including the 1st day of November, 1911, was all used and paid out in the conducting and carrying on of said business.' (c) There was no evidence to support the finding 'that no part of the moneys received and now in the hands of the trustee of the above estate came from the proceeds of the sale of flour so shipped on consignment.'

"(2) That the uncontradicted evidence in the case shows as follows: (a) That during the months of May and August, 1911, the petitioner, the Hubbard Milling Company, a corporation, shipped and delivered to said Larkin & Metcalf, as their agents, two cars of flour, which said two cars of flour was sold by said Larkin & Metcalf as agents of said Hubbard Milling Company, a corporation, and the proceeds of the sales thereof were afterwards collected and paid into the hands of the trustees of the above bankrupt estate, and said proceeds of the sale of said flour aforesaid was and is still held by said trustee, and that said proceeds of the sale of said flour is the property and money of the Hubbard Milling Company, a corporation, petitioner herein.

"(3) That said referee in bankruptcy erred in finding and holding that the $1,538.60, proceeds of the sale of said property, was not the property of the petitioner and disallowing the application and petition of the petitioner, and also erred in not ordering and directing the trustee to pay to the petitioner the sum of $1,538.60, or such portion thereof as had been taken and used in the conduct of the business of said bankrupt estate prior to the appointment of the trustee in bankruptcy herein.

"(4) The referee erred in finding and holding that the claim of the petitioner was not a preferred claim against the estate of said bankrupts, in so far as the proceeds of the sale of said flour had been taken and used in the operation of said business by said E. J. Grover et al. during the time they were in charge and control of said business.

"(5) That the referee erred in finding and holding that the proceeds of the sale of such flour mentioned above that came into the hands of E. J. Grover et al., trustees appointed by the creditors and by them accounted for in the

operation of said business, did not constitute a preferred claim in favor of the petitioner and against the trustee in bankruptcy.

"Wherefore, your petitioner feeling aggrieved because of such order prays that the same may be reviewed as provided in the bankruptcy law of 1898 and its amendments and general order xxvii."

It appears from an examination of the record herein: That a verbal contract was entered into by and between the members of the firm of Larkin & Metcalf and a representative of the Hubbard Milling Company, whereby the firm of Larkin & Metcalf were to handle, on consignment, certain brands of flour therein referred to manufactured by the Hubbard Milling Company at their various places of business. That, in compliance with said agreement, the Hubbard Milling Company on or about the 17th day of May, 1911, shipped to the bankrupts at Madison, S. D., one car load of flour, and on the 3d day of August, 1911, another. That on or about the 10th day of July, 1911, by an arrangement with a part of the creditors of Larkin & Metcalf, three persons were placed in charge of the business affairs of Larkin & Metcalf. That at the time of this arrangement by which these representatives of certain of the creditors of Larkin & Metcalf took possession of the business of Larkin & Metcalf, a portion, if not all of the shipment of May 17th had been delivered by Larkin & Metcalf to purchasers, and that the shipment of August 3, 1911, to Larkin & Metcalf was delivered, sold, and disposed of by the acting representatives of the firm of Larkin & Metcalf, all of which was done under the verbal contract, whereby the same was to be handled by them upon consignment, and I think it may fairly be said that there is no dispute in the record as to the relation of the bankrupts and these petitioners, with reference to these transactions. The flour was and remained the property of the petitioners. The money collected therefor, less the commissions agreed upon, was, and remained, the property of the petitioners.

It further appears from the record that at the time of the filing of the petition in bankruptcy both of said car loads of flour had been disposed of and delivered to the purchasers, and the proceeds thereof collected by the bankrupts and their representatives, and used in paying the debts of Larkin & Metcalf and the expense of running the business. It further affirmatively appears that all moneys had been paid out, and there were no moneys belonging to said estate in the hands of the representatives of the bankrupts just prior to the date of filing the petition in bankruptcy; that all moneys that had been received by them had been paid out, including the money received for these two car loads of flour, and used toward the payment of debts of the bankrupts, and the expenses in the management of the business of the bankrupts; that thereafter, and about the time of the filing of the involuntary petition herein, certain property consisting of grain, etc., belonging to the bankrupts, was disposed of, and money in the sum of a little more than $12,000 realized from the sale thereof was turned over to the bank-

rupt, and is held by him as assets of said estate. The referee found, as appears from the above order:

"All of the proceeds from the sale of this flour, together with all other business done in conducting said business by said agents or trustees up to and including the 1st day of November, 1911, was all used and paid out in the conducting and carrying on of said business; that on the 1st day of November, 1911, an involuntary petition was filed against said bankrupt firm, and that on the 5th day of December, 1911, the members of said firm were adjudicated bankrupts; that no part of the moneys received and now in the hands of the trustee of above estate came from the proceeds of the sale of the flour so shipped on consignment."

The questions suggested by the record are:

(1) What was the interest of these petitioners in these two car loads of flour, and the proceeds of the sale of said flour in the hands of the bankrupt?

(2) Did the money collected from the purchasers of said flour by the bankrupts and their representatives belong to the petitioners?

(3) If the petitioners were the owners of the flour and of the proceeds thereof intrusted to the bankrupts and their agents, by whom it has been misapplied, are they entitled to a general lien upon the assets of the trustee in bankruptcy of the estate of the bankrupts for the value of such property as against the general creditors, or have they such right to the moneys acquired about the time of the filing of the petition solely from the sale of other property of the bankrupts, it affirmatively appearing from the findings that the entire property of the petitioners was delivered to purchasers, and the entire proceeds of such sale misappropriated by the bankrupts and their agents, and the whole thereof, together with all other moneys on hand after such collections were made, were thereafter and before bankruptcy used by the bankrupts and their representatives in the payment of debts and other expenses of the business?

The contention of the petitioners that the findings of fact contained in the order made by the referee are not supported by the evidence is untenable. Without attempting a review of the testimony, it is sufficient to say that, after a careful examination of all of the evidence, I am of the opinion that the findings of the referee are fully supported by the evidence, or, at least, that there is no clear preponderance of the evidence against the referee's findings.

The referee's findings are therefore sustained.

[1] It seems clear upon a consideration of all of the evidence that Grover and others, who had charge of the business prior to the time of the filing of the petition in bankruptcy, were the representatives of these bankrupts, and that whatever was done by them with reference to this transaction was the act of the bankrupts. The relation of debtor and creditor never existed between petitioners and the bankrupts, and, in answer to the first question above suggested, these petitioners were the actual owners of the two car loads of flour in dispute. There was never any promise on the part of the bankrupts to pay for the flour or any personal responsibility

therefor, and the petitioners could have obtained possession of the flour at any time before it was sold, whether before or after Larkin & Metcalf were declared bankrupts. This being true, the money collected by the bankrupts, or by Grover and others, before the bankruptcy petition was filed, upon the sale of this flour, belonged to the petitioners.

Answering the third question, it is contended on behalf of the petitioners that the proceeds of the sale of this flour, even though wholly misapplied by the bankrupts to the payment of their debts and the expenses of managing the business, was impressed with the character of a trust fund, and that the trust may be enforced against any assets of the bankrupts in the hands of their trustee, and especially that they are entitled to a preference to the amount of their said claim to the moneys in the hands of the trustee. It is found by the referee that none of this money of the petitioners, collected for the sale of said flour, came into the hands of this trustee, and it is further shown by the evidence that the proceeds of the sale of the petitioners' flour, together with all other money on hand, was paid out, and that the bankrupts had no money of any kind or character just prior to the time of the filing of the petition in bankruptcy herein, with the affirmative finding that all of the assets of said estate represented by the money in the hands of the trustee in bankruptcy herein, was the proceeds of and received upon the sale of distinct separate items of property of the bankrupts, indicated and referred to in the evidence herein, and in no way connected with the flour of the petitioners in question herein, and had never been commingled with any part of the proceeds of the sale of said flour.

There is no recognized ground upon which equity can pursue this fund and impose upon it the character of a trust, except upon the theory that the money is still the property of the petitioners. If the petitioners herein are to be permitted to follow the fund received by the bankrupts or their agents upon the sale of this flour, and recover it, it is because the property belongs to the petitioners whether in the form in which they parted with its possession or in a substituted form. Under the earlier rule, petitioners would have been required to identify it as the very property which they had confided to another.

[2] The modern and more equitable doctrine permits the recovery of a trust fund from any one, not an innocent purchaser, and in any shape into which it may have been transmuted, provided he can establish the fact that it is his property or the proceeds of his property, or that his property has gone into it and remains in a mass from which it cannot be distinguished. Spokane County v. First Nat. Bank, 68 Fed. 979, 16 C. C. A. 81.

[3] The earlier English doctrine was to the effect that the owner of property intrusted to another could follow and retake the same from the possession of the holder whether he was agent, bailee, or trustee, or from others who were in privity with him, so long as they were not bona fide purchasers for value, and this, irrespective of whether such property remained in its original form or had been changed into some other form, so long as it could be ascertained to be

the same property or the proceeds of the same property but that the right ceased when the means of ascertainment failed. It was further held that such means of ascertainment failed when the property was in the form of money, and had been mixed and confused in a general mass of money of the same description. The more recent doctrine, however, follows the rule announced in Re Hallett's Estate (Knatchbull v. Hallett) 13 Ch. Div. 696, which is to the effect that, if money held by one in a fiduciary character has been paid by him to his account at his banker's, the person for whom he held the money can follow it and has a charge on the balance in the banker's hands, and that if the depositor has commingled it with his own funds in the bank, and has afterwards drawn out sums upon checks in the ordinary manner, he must be held to have drawn out his own money in preference to the trust money, and that, if he destroyed the trust fund by dissipating it altogether, there remains nothing to be the subject of the trust; that only so long as the trust property can be traced and followed into other property into which it has been converted does it remain subject to the trust.

There has been some diversity of opinion as to the meaning of these decisions, but I think a reasonably uniform approval of the doctrine generally. Some have interpreted it to mean that in a suit brought to pursue trust property it is only necessary to show that the estate has actually received the benefit of the trust fund, and that it makes no difference that the plaintiff is unable to show that his fund, or property which represents it, is then in the estate in any form, or has actually gone into the hands of the assignee or receiver. Spokane County v. First Nat. Bank, supra. See citations at page 981 of 68 Fed., at page 83 of 16 C. C. A. By a careful reading of these various opinions it is clear that the courts were influenced largely by the consideration that the estate of the insolvent, and thereby the general creditors thereof must have received the benefit of all the trust funds unlawfully used by the insolvent in the course of business or the payment of debts. Thus it is said in Peak v. Ellicott, 30 Kan. 156, 1 Pac. 499, 46 Am. Rep. 90, one of the cases cited:

"As the estate was augmented by the conversion of the trust fund, no reason is seen under the equitable principle which has been mentioned why they should not become a charge upon the entire estate."

Another court has said:

"The creditors, if permitted to enforce their claims as against the trust, would secure the payment of their claims out of trust moneys." Plow Co. v. Lamp, 80 Iowa, 722, 45 N. W. 1049, 20 Am. St. Rep. 442; Harrison v. Smith, 83 Mo. 216, 53 Am. Rep. 571.

I am of the opinion, however, that it cannot be said that because these bankrupts or their representatives misapplied trust funds and paid debts of the bankrupt, and paid the expenses of running the business with such funds, that, therefore, the general creditors of the estate are by that amount benefited, and that because of such benefit therefore equitable considerations require that the owners of the trust fund be paid out of the estate, to the exclusion of general creditors. If, as in this particular case, it is shown that this money was recently

used to pay debts of the bankrupt, and the expenses of conducting the business, that would otherwise be claims against the estate of these bankrupts, it would be a great injustice to require that the money so paid out should be refunded out of the other assets; and why? Because by paying out of the general assets the amount of this trust fund that had been used for the payment in full of other obligations and the expenses of running the business the general creditors who are entitled to the general assets of the bankrupts are thereby required to contribute toward the payment in full of these creditors whose demands have been extinguished by the trust fund. It does not appear that the money for distribution in this case includes any part of that belonging to the petitioners herein. If it did appear, the lien of the petitioners would attach, and they would have preference. The commingling of this trust fund of the petitioners with the private funds of the bankrupts would not destroy the right of the petitioners to follow it. The commingling being wrong, the entire fund of the bankrupts was impressed with the trust, until it was all used for other purposes as above stated, but the trust does not extend to funds with which it was never commingled. Mercantile Trust Co. v. St. L. & S. F. Ry. Co. et al. (C. C.) 99 Fed. 485; In re Wolff (C. C.) 99 Fed. 485.

Judge Adams, then District Judge for the Eastern District of Missouri, after announcing the above doctrine, said:

"There is another line of authority announcing the proposition that, because a trust fund when appropriated by a trustee to his own use swells his assets, the general estate of the trustee when insolvency supervenes. will be impressed with the trust for the reimbursement of the cestui que trust on the ground that such estate has been benefited to an equal amount by the trustee's breach of duty. But this rule, as I understand it, has not received the sanction of any federal court and of but few state courts. The equity or rather the want of equity of such a rule is well characterized by the Court of Appeals of New York in the case of Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504." Mercantile Trust Co. v. St. L. & S. F. Ry. Co., supra, 99 Fed. 488.

The court in that case further says:

"Following the well-settled rule already stated that the entire account with which the trust funds have been commingled may be appropriated for the satisfaction of the trust, and giving the intervener the full benefit of that rule, I am of the opinion that the minimum amount found at any one. time in the account of the company must be the maximum amount of the trust fund which by any possibility can be traced into the receiver's hands." Mercantile Trust Co. v. St. L. & S. F. Ry. Co. (C. C.) 99 Fed. 488.

In the case at bar, "the minimum amount found at any one time" in the cash account of the bankrupts and their agents, after the collection and misappropriation of the proceeds of the sale of the flour in question, was absolutely nothing. All of the money received from the sale of the flour and all other sources had, shortly before the involuntary petition in bankruptcy was filed, been used in the payment of claims against the bankrupt and in the payment of the expenses of the management of the business. The identification of the original trust fund of the petitioners was lost when the whole of the proceeds of the flour in question were, with all of the other funds with which

it has been intermingled, paid out to the creditors of the bankrupt, and for the payment of the expenses of the conduct of the business of the bankrupts.

The decisions of the state of South Dakota recognize the principle here stated, as I read them.

In Farmers' & Traders' Bank v. Kimball Milling Co., 1 S. D. 388, 47 N. W. 402, 36 Am. St. Rep. 739, the property conveyed in that particular case could be identified and was acquired with fraudulently or unlawfully obtained funds. The property so obtained had been used in the purchase of other property, and it was there held that that particular property was impressed and chargeable with a trust in favor of the beneficiary to the extent of the fund traceable into the property.

In Kimmel v. Dickson, 5 S. D. 221, 58 N. W. 561, 25 L. R. A. 309, 49 Am. St. Rep. 869, $265 was placed in the bank at Armour, in Douglas county. That same was held to be a trust fund. There was no attempt, however, to impress this trust fund a lien upon all of the assets of the bank. The bank failed and had only $259.71 in cash assets, with which it was shown this trust fund of $265 had been commingled. In this case plaintiff was only allowed to recover the amount of the cash assets, $259.71, the amount left in the fund in which it was shown by the record it had been deposited.

In Plano Mfg. Co. v. Auld, 14 S. D. 518, 86 N. W. 23, 86 Am. St. Rep. 769, the same principle is recognized in the opinion of Judge Fuller, as follows:

"One dollar being the same as another in every material respect, an earmark is not essential to its identification, and, if a sufficient amount in cash remains in the vault of an insolvent bank, it may be reclaimed by its owner to the exclusion of general creditors. The presumption governing modern courts in tracing a trust fund wrongfully mingled by a trustee with his own funds out of which aggregate he has made disbursements in the, due course of business is that he used his own money in preference to embezzling that of others."

In the case at bar it appears from the record that the cash assets of the bankrupts with which this trust fund of these petitioners was mingled was fully dissipated, wholly paid out, no part of it left, and the specified source from which the moneys on hand when the petition in bankruptcy was filed were acquired is set forth in the record.

In McCormick H. M. Co. v. Yankton Sav. Bank et al., 15 S. D. 196, 87 N. W. 974, the court found that the relation of debtor and creditor existed between the bank and the machine company and therefore that there was no trust fund.

Under the facts in this case, as they have been herein referred to, it is manifest that these petitioners are not here claiming their own property intrusted to the bankrupts, nor the proceeds thereof, nor seeking to recover from a cash fund with which the proceeds of the sale of this flour was mingled, but are here claiming a preference over other creditors out of a cash fund realized upon sale of specified property of the bankrupts. I am of the opinion that there is no statute in this state giving any such preference, nor any bankruptcy statute of the United States giving such preference to the petitioners herein. Little

v. Chadwick, 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570; Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504; Association v. Austin, 100 Ala. 313, 13 South. 908; Shields v. Thomas, 71 Miss. 260, 14 South. 85, 42 Am. St. Rep. 458; Silk Co. v. Flanders, 87 Wis. 237, 58 N. W. 383; Slater v. Oriental Mills, 18 R. I. 352, 27 Atl. 443; Armstrong v. Bank (D. C.) 38 Fed. 883; Multnomah County v. Bank (C. C.) 61 Fed. 912; Massey v. Fisher (C. C.) 62 Fed. 958; Board of Fire & Water Commissioner of Marquette v. Wilkinson et al., 119 Mich. 655, 78 N. W. 893, 44 L. R. A. 493; Ill. Trust & Sav. Bank of Chicago v. First Nat. Bank of Buffalo (C. C.) 15 Fed. 858; In re Richard (D. C.) 104 Fed. 792; In re Galt, 120 Fed. 64, 56 C. C. A. 470. This same doctrine has been sustained by the Wisconsin Supreme Court consistently since the date of Nonotuck Silk Co. v. Flanders, 87 Wis. 237, 58 N. W. 383, which specifically overruled the different doctrine announced in McLeod v. Evans, 66 Wis. 401, 28 N. W. 173, 214, 57 Am. Rep. 287.

The doctrine announced in Peak v. Ellicott, relied upon by the petitioners herein, 30 Kan. 156, 1 Pac. 499, 46 Am. Rep. 90, was referred to by Circuit Judge Gilbert in Re Spokane Co. v. First Nat. Bank of Spokane, 68 Fed. 979, 16 C. C. A. 81, and the rule therein announced was repudiated.

It follows that, the petitioner having failed to prove that any of the property belonging to petitioners either in its original, commingled or in any form came into the hands of the trustee in bankruptcy herein, any trace or identification of the original trust fund or any part thereof is impossible.

The exceptions of the petitioners herein are overruled, and the order of the referee should be affirmed. It is so ordered.