C. H. SEELEY, Plaintiff, v. SEELEY-HOWE-LE VAN COM-
PANY, Defendant; JAMES DIXON and CECIL DIXON,
Interveners, Appellees; C. W. JOHNSTON, Receiver,
Appellee; DES MOINES NATIONAL BANK, Intervener,
Appellant.

**Minor's contracts:** DISAFFIRMANCE: FRAUD. In a proceeding to
1   disaffirm a minor's contract for the purchase of corporate
stock and to recover back the consideration paid therefor, the
evidence is reviewed and held sufficient to show that the in-
dorsee of the minor's note, given as part consideration for
the stock, obtained the same with knowledge of the minority
and that it was originally procured by fraudulent representa-
tions as to the solvency of the corporation.

**Disaffirmance:** RELEASE OF MINOR AND SURETY. Timely disaffirm-
2   ance and a return or offer to return the consideration received
will relieve both a minor and his surety from further liability
on the minor's contract, even though the obligation is held
by an indorsee where such indorsee took the same with
notice of the minority, that disaffirmance was about to be
made, and also knowing at the time it took a renewal obliga-
tion that the payee was insolvent.

**Insolvency:** PREFERENCES. Neither a claim for damages for false
3   representations in the sale of corporate stock, nor for money
paid in the purchase thereof by a minor on a contract which
he afterwards disaffirmed, nor the claim of an indorsee of
such contract who has been denied recovery thereon because
of the disaffirmance, are entitled to preference in the distribu-
tion of the insolvent estate of the corporation.

*Appeal from Polk District Court.*— HON. JAMES A.
HOWE, Judge.

SATURDAY, JUNE 10, 1905.

THE opinion states the material facts of the case.—
*Affirmed.*

*Read & Read* and *C. L. Powell,* for Des Moines National Bank.

*Edmund H. McVey* and *E. C. Stevenson,* for James Dixon and Cecil Dixon.

*N. T. Guernsey,* for receiver.

WEAVER, J.— In March, 1901, one C. H. Seeley was engaged in business as a dry goods merchant at Des Moines, Iowa.   At the same time W. R. Howe and C. D. Le Van were engaged in a similar business in the State of New York.   These parties at the date mentioned entered into a written .contract for the organization of a corporation which should take over their several stocks of goods and carry · on the united business at Des Moines under the corporate business name.of Seeley-Howe-Le Van Company, with an authorized capital stock of $100,000.   The organization was perfected in May, 1901.   The goods and fixtures owned by Seeley were taken over at a valuation of $58,000, subject to an indebtedness of $3,000, and shares of stock issued to him therefor to the amount of $55,000. Howe and Le Van each put in goods of the valuation of $10,000, receiving in return shares to a like amount. Later Howe and Le Van purchased stock to the amount of $8,000, and sales of shares were made to other parties to the full amount of the authorized issue.   Among those sales was·an issue of fifty shares to Cecil Dixon, one of the appellees herein, and it is out of this transaction that the controversy now before us has arisen.   For said stock Cecil Dixon paid to the corporation the sum of $1,000 in money, and gave to it his promissory note for $4,000, under date of August 8, 1901, and payable on or before February 8, 1902.   Soon after it was delivered, Seeley requested Dixon to have his father sign the note in order that it might be used temporarily as collateral at the bank.   This request

was complied with, and the note passed into the hands of the Des Moines National Bank. When this note became due, the bank, claiming to have discounted it, demanded payment. Dixon was not prepared to pay it, and it was arranged between him and the bank that a new note be given signed by Dixon and his father and indorsed by the Seeley-Howe-Le Van Company, and time of payment extended. In accordance with this agreement, Dixon procured the signature of his father to the renewal note and the indorsement thereof by the corporation, and delivered it to the bank. This note, which was made February 25, 1902, bears date February 11, 1902, and is payable to the order of the Seeley-Howe-Le Van Company six months after date. On March 17, 1902, Seeley began this action in equity for the appointment of a receiver to wind up the affairs of the company because of its insolvency. Prior to this date, on February 22, 1902, said Cecil Dixon, who was then a minor, disaffirmed the purchase of the stock and tendered the same back to the corporation, and demanded a return of the consideration given therefor. Seeley, representing the corporation, accepted a return of the stock, and, being unable to command the money at that time, executed and delivered to Dixon the promissory note of the corporation for $5,000. This note at the request of Dixon was made payable to his father, James Dixon. On May 28, 1902, written notice of the disaffirmance of said purchase, and of the promissory note given in payment thereof, and of the renewal of the note thereafter given at the request of the bank, was served upon the Des Moines National Bank.

On June 3, 1902, Cecil Dixon intervened in the equity action brought by Seeley as aforesaid, alleging that he had been induced to purchase said stock by the false and fraudulent representations of the corporation as to its solvency and the condition of its property and business. He also alleges that he was a minor at the date of said

transaction, and avers that the bank took said note for $4,000, and renewal thereof, with notice of his minority and of the fraud practiced upon him, and asks that said note be declared void. and delivered up for cancellation. He also declares his disaffirmance of the settlement by which he accepted the note of the corporation for $5,000, tenders said note to the corporation and to the receiver for its use, and asks that he may have allowed, as a preferred claim against the receiver, the sum of $1,000 for the money paid by him on the original purchase of the stock. James Dixon also intervenes, setting up the same alleged facts, and further avers that he was induced to sign said renewal note upon the representations of the bank and of the Seeley-Howe-Le Van Company, upon which he relied, to the effect that said corporation was financially solvent and responsible and able to pay said sum, when in truth and in fact, to the knowledge of said bank, the concern was hopelessly insolvent, and upon these allegations he unites in the demand of Cecil Dixon for the surrender and cancellation of the note.

To these interventions the Des Moines National Bank appeared and answered, denying all allegations of fraud on its part, and all notice of any alleged fraud or false representations on part of the corporation or of the minority of the intervener Cecil Dixon, prior to the making and delivery of the note now in controversy. It alleges that it discounted the first note in the usual course of business, without knowledge or notice of any infirmity therein or defense thereto, and that on February 25, 1902, it accepted the note now in its hands in payment and renewal of the former note, without notice of any of the matters now pleaded against its validity. The said bank also affirmatively pleads the giving of the note, and asks judgment against the Dixons for the amount thereof, principal and interest. In defense to this counterclaim, Cecil Dixon and James Dixon replead in substance the allega-

tions contained in their petitions of intervention. The
trial court found for the interveners, Cecil Dixon and
James Dixon, that the note held by the Des Moines· Na-
tional Bank is invalid in its hands, and permanently en-
joined said bank from any attempt to enforce collection
thereof. The decree also established the claim of Cecil
Dixon against the receiver of the corporation in the sum
of $1,000, and interest, without preference. From this
decision the Des Moines National Bank has appealed. It
also appeals from the denial of its claim for a preference,
as against the fund in the receiver's hand, to the extent
of the Dixon note. Cecil Dixon has also appealed from
so much of said decision as denies preference to his claim
for $1,000 and interest, and denies him any allowance
for interest paid on the note held by the bank, as well
as from the order of the court taxing him with one-third
of the costs in the case.

This tedious statement of the controversy has seemed
to be necessary to a fair understanding of the case. There
is some controversy as to the record presented by the ab-
stracts, and we have been required to examine the tran-
script which has been furnished, but we think the fore-
going omits no matter or fact of controlling importance.

I. Without incumbering this opinion with any pro-
longed statement or discussion of testimony in detail, we
have to say we think the finding of the trial court upon

1. MINORS'
CONTRACTS:
disaffirmance;
fraud.

the facts in controversy fairly reflects the
preponderance of the evidence. There can
be little, if any, doubt that this corporation,
which was confessedly hopelessly bankrupt within nine
months after its organization with an apparent capital of
$75,000 to $100,000, employed in a line of business not
exposed to sudden and great hazards, was radically un-
sound from the hour of its inception. That its unsound-
ness was apparent to its managers and to all who had ad-
mission to their confidence as early as the date of the

sale of the stock to Cecil Dixon is equally clear.   This business was scarcely under way before the corporation found itself in need of money, and at the very time of the transaction with Cecil Dixon the principal owners were exerting themselves to the utmost, and with but little success, to dispose of the unsold shares of stock, and to devise other expedients to relieve themselves from the financial straits in which they were involved.   Says Mr. Le Van:

At that time we were hard pressed for money, and, inasmuch as the bank had refused us further credit, we decided to take Dixon's money and give him a position in the store as the next best thing to do.   In the matter of paying him back his original stock, we figured that we could stand the loss, if any.   By having this money it would give us that much more to put us in position where we felt that we might be able to put the business on a paying basis.   I talked the matter over fully with Mr. Howe and Mr. Seeley, and we all knew that he was not of age.   Mr. Seeley talked with the bank regarding the matter several times, and said that they would cash his note, and, after the negotiations were about closed with Mr. Dixon, Mr. Seeley came back from the bank and said that they would have to have an indorser.

Again, he says:

After having failed to raise money, we decided among ourselves that the only way to raise money was to sell the balance of the unsold stock.   The bank was familiar with all these transactions, and was consulted by Mr. Seeley. Mr. Reynolds was nearly always consulted.   Pursuant to this plan, stock was sold to Cecil Dixon, Mr. French, and others during the summer and fall.   Seeley was insolvent, in my opinion, when we went into business with him. There was a sort of mutual understanding that the bank was to be informed of any important transactions, and their opinions and wishes consulted.   According to my judgment, the bank was fully informed in regard to the selling of the stock to Cecil Dixon.   James Dixon did not sign the $4,000 note at first.   On the 8th of August, on the day the Cecil Dixon note was given, we were in need of money, as here-

tofore stated. According to my belief at this time, we were then insolvent. We then needed money to pay past-due bills. The paying in of this money of Cecil Dixon's was a great relief to our minds, as we realized that we needed it badly. As I remember now, Mr. Seeley was much worried at that time, as he appeared to be through the whole year, about our financial condition. We had exhausted all means of securing money, and it was absolutely necessary to have money.

Unquestionably the perilous condition of the business and the pressing necessity for immediate relief gave added brilliancy to the roseate hues in which Mr. Seeley painted the business conditions and prospects of the corporation to the prospective purchaser of the stock. Mr. Dixon was told that the goods in store represented a value of $100,-000, with comparatively little indebtedness, that the business was in a solvent and prosperous condition, and that he would be guaranteed a dividend of not less than 20 per cent. on his investment. The good impression thus created was emphasized and confirmed by an agreement to repurchase the stock at par if at the end of 18 months Mr. Dixon desired to surrender it. That the representations made were essentially untrue and designedly misleading is a matter of which the candid reader of the record can entertain no doubt. Just how far the bank may have been advised of the fraud thus practiced upon the young man is not entirely clear, and the law indulges the presumption of good faith in its favor. It is hardly possible, however, that it did not know that the business of the corporation was in a tottering condition. The bank was a principal creditor of Seeley, and, when his business was merged into the corporation, took his personal obligation for $22,500, secured by a deposit of the company's stock. With the care and scrutiny which banks generally exercise in respect to the financial condition of men to whom they extend large accommodations, it is not to be believed that this bank was not aware of Seeley's weakness, and

that the corporation of which he was the largest owner entered upon its existence with clouded prospects. These facts are not mentioned as indicative of bad faith on part of the bank, but as showing the great probability that the condition, management, and progress of the business of the corporation were watchfully supervised by the bank, and that no important move on part of the corporation was likely to escape its attention. It is admitted that Cecil Dixon consulted the president of the bank concerning the purchase of the shares of stock and inquired as to the soundness of the enterprise, and, while there is a dispute as to the exact effect of the conversation, both versions indicate that the statements made by the president were of a character to encourage the belief in Dixon that the investment was a desirable one. We are of the view, however, that the right of the Dixons to be relieved from obligation upon the note for $4,000 is not dependent upon their showing that the bank took the original note with notice of the fraud practiced upon them, and we do not pass upon that question of fact. Of the knowledge of the bank as to all essential facts at the time the renewal note was procured, and its part in the procurement of that obligation, we will hereinafter speak. In disposing of the alleged misrepresentations by which the sale to Cecil Dixon was effected, we do not overlook the fact that Seeley enters a sweeping denial of the testimony of Dixon in this respect, but we are satisfied that the version given by the latter, corroborated as it is by Le Van, as well as by numerous facts and circumstances which afford valuable side lights upon the situation, is entitled to the greater credit.

II.   That Cecil Dixon was a minor at the time of all the transactions involved in this litigation is not denied; and we come now to consider the effect of that fact and of his subsequent disaffirmance of said transactions upon the rights of the parties. As to Cecil Dixon himself

his right to be relieved from legal liability by timely dis-
affirmance of the contracts and returning or
offering to return the consideration received
by him is clear. Code, section 3189; *Jenk-
ins v. Jenkins,* 12 Iowa, 195; *Childs v. Dobbins,* 55 Iowa,
205; *Leacox v. Griffith,* 76 Iowa, 89; *Bank v. Hall,* 106
Iowa, 542. There is no evidence in this case of an
emancipation of the minor, and we find no sufficient
evidence that he had engaged in independent business
to an extent which would afford the party dealing with
him good reason to believe him legally capable of con-
tracting. His disaffirmance, therefore, of the purchase of
the stock and of the transaction by which he received the
note of the corporation for $5,000, had the effect to re-
lease him from all liability upon the note given by him,
even in the hands of an innocent purchaser. *Jenkins v.
Jenkins, supra.*

*2. DISAFFIRM-
ANCE: release
of minor
and surety.*

We have, then, to consider the relative rights of the
banks as holder of the renewal note, and of James Dixon
as surety thereon. It is the settled law of this State that
the mere disaffirmance of his contract by a minor does
not release the obligation of his surety (*Jones v. Crosth-
waite,* 17 Iowa, 393; *Allen v. Berryhill,* 27 Iowa, 534),
but such effect does follow a disaffirmance accompanied by
a return or surrender of the consideration received for
the contract. *Bank v. Hall,* 106 Iowa, 542.

The only further question, then, is whether the fact
that this note had passed into the hands of the bank be-
fore its disaffirmance by the minor exempts it from the
operation of the rule here cited, and leaves it enforceable
against the surety. If the bank were a purchaser with-
out notice, this inquiry might not be entirely free from
difficulty, but we are of the opinion that it does not occupy
that position. It is very certain that, when the renewal
note was given, the bank had notice of the minority of
Cecil Dixon, and that he had disaffirmed or was about to

disaffirm his purchase of the stock; and the preponderance of the evidence is to the effect that it had notice of the young man's minority even before the original note was discounted. Moreover, at the time the renewal note was demanded, the bank was well aware that the corporation was staggering to its final fall. It knew that an invoice had been taken showing a loss of $50,000 in less than a year's business, and by its assistance an expert accountant had been procured and was then investigating the books. According to that examination, completed just before this suit was instituted, there had been an overissue of stock to the amount of $33,000, and the business was insolvent to the extent of over $44,000. From January 15, 1902, when the result of the invoice had been ascertained, if not at an earlier date, the bank officers must have comprehended that the corporation had been from its outset a financial bubble inflated to the bursting point, and that every person who had been induced to purchase its stock at par was presumably the victim of fraud. Indeed, the admitted fact that the bank held the individual obligations of Seeley in a large amount, representing indebtedness which accumulated before he unloaded the business upon the corporation, and that from the very first the bank limited the credit to be extended the corporation to the comparatively nominal amount of $5,000, while it also held practically all of the shares of the capital stock as collateral security for its claims, indicates that it was not ignorant of the unsubstantial character of the concern. This knowledge of the true condition of the business was studiously withheld from Dixon when, preparatory to making the renewal, he inquired of the bank as to the financial status of the Seeley-Howe-Le Van Company. Instead of putting him on his guard at this critical moment, when possibly he and his surety might have taken measures to secure themselves against this loss at the hands of the corporation, he was given to understand that the

business was in a prosperous condition, and that there was no occasion for alarm. There is a dispute as to the extent of the assurances given him by the cashier, but enough is conceded by the latter to make it clear that such statements as were made, however ambiguous and vague they may appear when analyzed with scrutiny, were intended to mislead the inquirer, and there is no less doubt that such was their effect. It is true that the bank was under no legal duty to give out information which would imperil its own interests, but, when a person who is about to assume or renew an obligation to such bank makes inquiry as to matters within its knowledge having material bearing upon the transaction then being negotiated, it should tell the whole truth or frankly decline to be interviewed upon that subject. Less than this is not compatible with good faith, and the law will not enforce an advantage thus secured. We conclude, therefore, that the district court was right in refusing to the bank any recovery against either the principal or surety.

III. Is the claim of Cecil Dixon entitled to preference in the distribution of funds in the hands of the receiver? In support of this claim we are cited to *Plow Co. v. Lamp*, 80 Iowa, 722, and *Brooke v. King*, 104 Iowa, 713, but neither seems to be in point. In one of these cases money belonging to the plaintiff had been wrongfully loaned by an agent having no authority to do so, to a person who received it with knowledge of its misappropriation; and in the other case a private banker had, as agent, sold the property of another, and deposited the money thus obtained in his own bank. In each instance the claim was given preference over the demands of general creditors. In neither case is it held that a claim for damages on account of false representation in a sale of property or a claim for moneys paid by a minor upon contract afterward disaffirmed is entitled to any priority in the distri-

3. INSOLVENCY: preferences.

bution of an insolvent estate.   Our attention is called to
no authority going to this extent, and we are inclined to
uphold the decision of the trial court in this respect.

The bank also insists that, in case it is denied recovery
against Dixon, its claim for the amount of the note should
be given preference against the receiver.   As we have al-
ready said in reference to the like claim of Cecil Dixon,
the authorities relied upon do not appear to be appli-
cable · to the facts here involved.   Whether a trust ex-
isted in favor of either of these parties as against the
corporation is not decisive of the right to a preference
in the distribution of the funds.   There must be some
showing that the estate has been augmented by the trust
fund, or, at least, " that the estate has been so benefited
by the misappropriation of the trust fund that its removal
or its equivalent from the estate will be without. prejudice
to creditors."  *Jones v. Chesebrough,* 105 Iowa, 303; *Jewell
v. Clay,* 107 Iowa, 52; *Bradley v. Chesebrough,* 111 Iowa,
126.  In the Jones case it is also said that in order to be in
position to demand a preference on the claim that the debt
represents a trust fund, it must appear " that it has been
preserved in the hands of. the assignee as an increase of as-
sets in his hands which may be taken without impairment of
the rights of creditors."   Such fact is not made to appear
in the case before us, and for this reason, if for no other,
the demand of the bank, as well as of Cecil Dixon for
preference, is not well founded.

The decree of the district court effects substantial
equity between the parties, and it is therefore *affirmed.*