SHUGART & BARNES BROS. et al., Appellees, v. A. N. & S. RAILWAY COMPANY, et al., Appellants.

**Railroads:** RECEIVERSHIP: DIVERSION OF INCOME: OPERATING EXPENSE: PRIORITY. A court of equity may in its discretion prefer unpaid claims incurred in the ordinary operation of a railroad within a limited time, to the claims of prior mortgagees under their mortgage, where it is shown that the current operating income has been diverted to the payment of the mortgage or the interest thereon, to the prejudice of claims for the operating expenses. In the instant case a portion of the current income had been recently applied on the mortgage indebtedness, and it is; *Held,* that the indebtedness of the railway company to connecting lines, growing out of their joint business in the matter of advance charges paid by such connecting lines, and joint loss or damage claims so paid, were claims for operating expense arising out of the current traffic, and for which the connecting and paying line was entitled to priority over the rights of the mortgagee.

**Same.** Where a railway company owned two branch lines, only one of which was in operation and upon which there was a mortgage, one having a mechanics lien against the other branch only could not object to a preference over the mortgage, allowed a connecting railway company for operating expenses due it, to the extent that current earnings of the branch operated had been diverted from the current operating expenses to payment on the mortgage debt.

*Appeal from Cass District Court.*—HON. T. A. ARTHUR, Judge.

WEDNESDAY, SEPTEMBER 24, 1913.

ACTION by the plaintiff to establish and foreclose a mechanic's lien against the principal defendant, the Atlantic Northern & Southern Railway Company, and its receiver, and against other defendants as alleged lienholders. The Chicago Rock Island & Pacific Railway Company appeared as an intervener and filed a petition of interven-

tion, claiming an equitable lien against the principal defendant and claiming priority over all other parties. There was a decree adjudicating the claims of all parties and fixing the priority and order of liens. Personal judgment only was awarded by such decree to the intervener against the principal defendant, and its claim of lien was denied. The intervener alone has appealed.—*Modified* and *Affirmed*.

*F. W. Sargent, Robert J. Bannister,* and *J. H. Johnson,* for appellant.

*Parker, Parrish & Miller, W. A. Follett* and *J. B. Rockafellow,* and *Read & Read,* for appellees.

EVANS, J.—The property of the principal defendant was in the hands of a receiver at the time of the trial below, and such receiver is a party to the case. Such principal defendant owned and operated a railroad in the state of Iowa consisting of two parts, which will be referred to in the discussion as the north and south "branches." The north branch extended from Atlantic, in Cass county, to Kimballton, a distance of seventeen miles. The south branch extended south from Atlantic for a distance of thirty-eight miles to Villisca. The north branch was first constructed and was in operation during the year 1910 and up to the time of the receivership in April, 1911. The south branch was in course of construction during 1910 and was not in operation. The claims of the plaintiff and the other mechanic's lien claimants arose for labor and material in the *construction* of the *south* branch. The claims of the intervener arose, in part at least, out of the *operation* of the *north* branch during the year 1910 and out of business jointly transacted by the intervener and the defendant as connecting carriers; there being a junction of the two roads at Atlantic.

The decree of the trial court established the mechanic's

liens of the plaintiff and the other claimants as primary liens upon the south branch. It also established them as liens against the north branch, subject to three certain prior mortgages thereon. The intervener claims its lien only as against the north branch and it claims priority over the mortgages as well as over the mechanic's liens.

The decree below was entered in pursuance of and in substantial conformity with the report of a referee before whom the evidence was produced. The referee reported the following findings as to the claims of the intervener:

Your referee finds that the Atlantic Northern & Southern Railway Company is indebted to the Chicago, Rock Island & Pacific Railway Company in the sum of $8,859.01; said indebtedness being made up of the following items, to wit:

| | | |
|---|---|---:|
| Item 1. | Earnings of the Chicago, Rock Island & Pacific Railway Company on commercial account for the month of December, 1910 | $2,075 75 |
| Item 2. | Advance charges paid by the Chicago, Rock Island & Pacific Railway Company on commercial account for month of December, 1910 | 759 53 |
| Item 3. | Earnings of the Rock Island for December, 1910, on ties shipped to Abeles & Taussig and consigned to points on the Atlantic Northern & Southern Railway Company other than Atlantic | 2,450 17 |
| Item 4. | Earnings of Rock Island for material consigned to the Atlantic Northern & Southern Railway Company to points other than Atlantic | 1,255 91 |
| Item 5. | Advance charges | 171 46 |
| Item 6. | Earnings of Rock Island outside the month of December, 1910, not in any settlement | 586 01 |
| Item 7. | For loss and damage claims paid by Rock Island | 402 09 |
| Item 8. | Bills for repairs, salaries of joint truckers | 1,158 09 |
| | | $8,859 01 |

Certain offsets were allowed reducing the net recovery of the intervener to a little less than $8,000.

The intervener's claim of priority or preference is based upon the equitable rule which has often obtained in receiverships of this nature, viz., that a preference will be given to the payment of operating expenses incurred within a period of six months prior to the receivership, to the extent of the current earnings of the road; and, when it is made to appear that the current earnings have been diverted within such period to the payment of mortgage liens, restoration will be made to such extent by way of preference in favor of the unpaid operating expenses.

1. RAILROADS: receivership: diversion of income: operating expense: priority.

The following excerpts from some of the cases will sufficiently indicate the equitable grounds upon which the intervener claims to stand in this court:

It is easy to see that the payment of unpaid debts for operating expenses, accrued within 90 days, due by a railroad company suddenly deprived of the control of its property, due to operatives in its employ, whose cessation from work simultaneously is to be deprecated, in the interests of both of the property and of the public, and the payment of limited amounts due to other and connecting lines of road for materials and repairs *and for unpaid ticket and freight balances,* the outcome of indispensable business relations, where a stoppage of the continuance of such business relations would be a probable result, in case of non-payment, the general consequence involving largely, also, the interests and accommodation of travel and traffic, may well place such payments in the category of payments to preserve the mortgaged property in a large sense by maintaining the good will and integrity of the enterprise and entitle them to be made a first lien. *(Miltenberger v. Logansport Railway Co.,* 106 U. S. 286-311, 1 Sup. Ct. 140, 27 L. Ed. 117.)

A court of equity engaged in administering mortgaged railroad property, under a receivership in a foreclosure suit, may in its discretion prefer unpaid claims for current expenses incurred in the ordinary operation of the railroad within a

limited time, *usually six months,* before the receivership, to the claims of bondholders secured by a prior mortgage, in the distribution of the income or of the proceeds of the corpus of the mortgaged property. The test of the equity which entitles a claim to a preference over the mortgage in foreclosure is whether the consideration of the claim was or was not a part of the current expenses of the ordinary operation of the corporation within time limited. *(Rodger Ballast Car Co. v. Ry. Co.,* 154 Fed. 629, 83 C. C. A. 403.)

If such a mortgagor diverts the current income from the payment of the current expenses to the payment of interest on the mortgage debt or to the improvement of the mortgaged property, so that current expenses remain unpaid when a receiver is appointed, the court may, out of the income accruing during the receivership, resort to the unpaid claims for current expenses the amount so diverted. But, if there has been no diversion, there can be no restoration, and the amount of the restoration cannot exceed the amount of the diversion. *(Illinois Trust & Sav. Bank v. Doud,* 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481.)

A mortgage of the property, acquired and to be acquired, and of the income of a quasi public corporation, such as a railroad company, obtains a lien upon the net income of the company after the current expenses of operation incurred in the ordinary course of business are paid and impliedly agrees that the gross income shall be first applied to the payment of these current expenses before the net income to which he is entitled arises. *(Illinois Trust & Sav. Bank v. Doud,* 105 Fed. 123. 44 C. C. A. 389, 52 L. R. A. 481.)

We do not now hold, any more than we did in Fosdick v. Schall [99 U. S. 235, 25 L. Ed. 339] or Huidekoper v. Locomotive Works, 99 U. S. 258, 260, 21 L. Ed. 344, that the income of a railroad in the hands of a receiver, for the benefit of mortgage creditors who have a lien upon it under their mortgage, can be taken away from them and used to pay the general creditors of the road. All we then decided, and all we now decide, is that, if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use. *(Burnham v. Bowen,* 111 U. S. 783, 4 Sup. Ct. 679, 28 L. Ed. 596.)

It is undoubtedly true that operation expenses, debts due to connecting lines growing out of an interchange of business, and debts due for the use and occupation of leased lines are chargeable upon gross income before that net revenue arises which constitutes the fund applicable to the payment of the interest on the mortgage bonds. (*St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co.*, 125 U. S. 658, 673, 8 Sup. Ct. 1011, 1017 31 L. Ed. 832).

Mortgage creditors of a railroad cannot complain of a decree requiring payment of unsecured debts due by the company to connecting railroads before the filing of the appeal, for moneys it had collected, when their refusal because of the failure to pay them to continue business relations with the receiver would have greatly diminished the receipts and impaired the business of the road. (*Meyer v. Johnston*, 53 Ala. 237.)

The appellees concede the operation in an appropriate case of the equitable rule thus contended for by the appellant. They emphasize certain qualifications or limitations thereon which we quote from their brief as follows:

If the debt for which a preference is claimed is not an ordinary and necessary operating expense or if the debt did not accrue within six months prior to the appointment of the receiver, or if there has been no diversion of the current income to the payment of interest on mortgaged indebtedness or for the betterment of the security of the mortgagees, there can be no preference. *Rodger Ballast Car Co. v. Omaha, K. C. & E. R. Co. et al.*, 143 Fed. 629 (83 C. C. A. 403) ; *Illinois Trust & Savings Co. et al. v. Doud et al.*, 105 Fed. 123 (44 C. C. A. 389, 52 L. R. A. 481) ; *Gregg v Metropolitan Trust Co.*, 197 U. S. 183 (25 Sup. Ct. 415, 49 L. Ed. 717) ; *Finance Co. v. Charleston, etc., Ry.*, 62 Fed. 205 (10 C. C. A. 323) ; *Southern R. R. Co. v. Carnegie Steel Co.*, 176 U. S. 257 (20 Sup. Ct. 347, 44 L. Ed. 458).

We quote from the appellees' brief the following as the propositions upon which they rely in support of the decree entered below:

(1) The burden is upon the appellant to show by a clear preponderance of the evidence that the indebtedness for which it claimed a preference accrued within six months prior to the appointment of a receiver, and that the indebtedness is of such a character as to make it a preferred debt over paramount liens. This the evidence fails to show.

(2) The debt for which a preference is claimed must be a necessary operating expense and must have accrued within six months prior to the appointment of a receiver. The evidence fails to show that the debts or claims in question are of this character.

(3) It must be shown by a preponderance of the evidence that there has been a diversion of the current earnings from the payment of current operating expenses to the payment of interest on bonds, or some other use or purpose which directly benefited the mortgagee and bondholders. This is not shown.

(4) No diversion of current earnings to the payment of construction claims is shown. No construction claims have in fact been paid from current earnings. As against the plaintiff and appellee Abeles and other mechanic lien judgment claimants, there can be no preference.

(5) In order that a court of equity may give a preference to a creditor over existing liens, equities must exist in favor of the claimant, which makes his claim superior to established liens. There can be no preference among creditors whose equities are equal. In this case no superior equities exist in favor of the Rock Island.

(6) The six months' preference rule has never been extended so as to give preference to claims, even for operating expenses, over claims for construction. While the claims of the plaintiffs and Abeles and other mechanic lien claimants are for construction claims on the south thirty-eight miles, yet their respective liens extended to and cover the north seventeen miles. As against them there can be no preference, even on the north seventeen miles of railroad.

From the foregoing quotations from the briefs of the parties, we are able to direct our attention to the very points of difference between them, and they are few. Three questions are presented for our consideration: (1) Does it appear that any of the items of intervener's claim were for

operating expenses within the meaning of the term? (2) Was there any diversion of the earnings of the road to the payment of mortgage liens? (3) Is the equitable rule under consideration applicable as against parties who did not receive the diverted earnings?

Upon this record it will be more convenient to take up the second question first, viz.: Was there a diversion of the earnings? During the trial the parties entered on record the following stipulation:

It is admitted that the gross earnings of the Atlantic Northern & Southern Railway Company for the calender year of 1910 were $34,210.10, and that the gross operating expenses, including the taxes for the same year, were $27,469.29, leaving the net earnings for the year $6,740.81. That out of these net earnings the Atlantic Northern & Southern Railway Company on July 1, 1910, paid interest on the mortgage or bonded indebtedness of the Atlantic Northern & Southern Railway Company in the sum of $2,025, and on the 1st of January, 1911, paid on the mortgage or bonded indebtedness of the same railway company the sum of $2,025. It is further agreed that in the gross earnings of the Atlantic Northern & Southern Railway Company is included its share of the earnings on all freight passing over the Chicago, Burlington & Quincy and Chicago, Rock Island & Pacific Railway Companies, or other lines, and delivered to the Atlantic Northern & Southern during the year 1910, so far as the same is carried on through billing or included in the interline account.

It will be seen from the foregoing that $2,025 was paid on the bonded indebtedness on January 1, 1911, and this was within six months prior to the receivership. The payment of July 1, 1910, may be disregarded, not having been made within six months. It must be said therefore that, if there were operating expenses unpaid, then the application of the earnings to the bonded indebtedness was a diversion to that extent.

Turning to the items entering into the indebtedness in favor of the intervener, should any of them be deemed as

an operating expense? Several of the items of such indebtedness arose out of the relations of the two railroads as connecting carriers. They necessarily made joint rates. The rates so charged were collected by one for the benefit of both. Claims for loss, damage, and overcharge arose against them jointly, and such claims were paid by one for the benefit of both. When freight was received from another connecting carrier, the freight charge of such carrier was advanced to it by one for the benefit of both and was later collected from the consignee by one for the benefit of both. These disbursements were carried in the form of an account. A settlement was had each month until December, 1910. For such month no settlement was had.

The following from the testimony of the local agent of the Atlantic Northern & Southern Railway Company at Atlantic will indicate the general nature of the transactions upon which several of the items are based:

This interline account which I have spoken of includes all shipments passing from one road to another. In the transportation of merchandise and other commodities which pass over both roads, there were from time to time claims made by the consignee or consignor for overcharge or damage and things of that kind. Claims of this kind as between the Atlantic Northern & Southern Railway Company and the Chicago, Rock Island & Pacific Railway Company were first started by the claimants and presented to the delivering line, and an investigation was made with reference to the merits of the claim, and after investigation, if it was determined that the claim was meritorious, the claim was paid by the line with which the claim was filed, and if paid by the Rock Island or the Atlantic Northern & Southern it was distributed on a mileage basis. That is, if the Rock Island paid them, the Atlantic Northern & Southern reimbursed them in proportion to the mileage it handled. After the investigation of a claim and when the claim was paid by the Rock Island, the Rock Island would bill on the Atlantic Northern & Southern for its proportion of the payment, and we authorized drafts made on them monthly. It was part of my duties to investigate and authorize

the payment of the Atlantic Northern & Southern's proportion of these claims. . . . We had a joint trucker here in Atlantic who handled freight for the Atlantic Northern & Southern at the freight house of the Rock Island. That was freight in less than car load lots that came in over the Rock Island, billed to some point on our line, and also freight in less than car load lots originating on our line and destined to some point on the Rock Island. He was actually paid by the Chicago, Rock Island & Pacific Railway Company. . . . The arrangement with reference to this trucker was that the Atlantic Northern & Southern Railway Company was to reimburse the Rock Island at the rate of $20 per month. . . . We would credit the Atlantic Northern & Southern Railway with a certain per cent. and charge the Rock Island its proportion, or, rather, I mean we credited the Rock Island with its proportion of 75 per cent. of freight charged and then at the end of the month the accounts between the railroads would be settled and that would be offset, which means if the Rock Island account was greater then the Atlantic Northern & Southern would pay the difference, and if it was the other way, the Rock Island would pay the Atlantic Northern & Southern. At the end of each month the Atlantic Northern & Southern rendered to the Rock Island a statement of business it had received from the Rock Island for the calendar month, showing the amount of the Rock Island earnings, and our monthly settlements were made on those statements, subject to the correction of any errors that might afterwards appear, and this $183.49 is the balance when the corrections are made on some such accounts. This $17.29 on this statement represents a difference in advances or prepayments as stated in the Atlantic Northern & Southern's settlement statement to the Rock Island against advances reported by the Rock Island agent. This item of $385.23 represents charges on waybills delivered to the Atlantic Northern & Southern which have not been included in any settlement for any month up to the present date. Those were waybills that were overlooked in making the monthly statement. This charge $759.53 represents charges advanced to connecting lines by the Chicago, Rock Island & Pacific Railway Company. This was on shipments that the Rock Island received from foreign lines and delivered to the Atlantic Northern & Southern Railway Company and which amounts the Rock Island paid to foreign lines. All these items, commencing with $2,075.75, and including the item of $759.53,

are what we have referred to as commercial shipments, and the total of these five commercial items is $3,421.29, making a total of all these three items which have been referred to as the Abeles & Taussig company material account and commercial account, $7,127.37. No part of this $7,127.37 has ever been paid to the Rock Island. Including the miscellaneous account referred to in 'Exhibit 207,' the total amount of all claims, including the interline account, the miscellaneous account, and loss and damage account, is $8,687.55.

Cross examination:

This $1,255.91 is freight on material of the Atlantic Northern & Southern, and the item of $2,075.75 is the Chicago, Rock Island & Pacific Railway Company's proportion of freight charges on regular commercial shipments and does not include the Abeles & Taussig items that was admitted or agreed upon. The charges making up this item of $759.53 are dated the various dates in December, 1910.

Taking the items as numbered in the report of the referee above quoted, we think that items 1, 2, 5, and 7, and at least a considerable part of items 6 and 8, should be deemed as operating expenses within the meaning of the equitable rule. They arose out of the current business. They were incidental to the freight transit. The mutual account was indispensable, in a practical sense, to the performance of their duties by both companies as connecting carriers. The defendant railway company could not have continued as a going concern without some practical arrangement of that kind. We see no fair reason for saying that these items were not a part of the ordinary and necessary operating expenses. Items 3 and 4, and perhaps a part of items 6 and 8, involved other elements and present a different question. We have no need to consider these because the other items exceed the sum of $2,025, which is the full extent of diversion shown.

The final question is: Is the intervener entitled to a preference as against the mechanic's lien claimants, the ap-

pellees herein? It will be noted from the stipulation above
quoted that the $2,025 of earnings diverted
was paid, not to these mechanic's lien claim-

2. SAME.

ants, but to the mortgagees. The argument is that, inas-
much as these appellees did not receive the diverted earnings,
they should not now be subjected to a preference because
thereof. The argument is not sound. The mortgage was a
lien prior to all liens of the appellees. It covered the north
branch alone. The intervener asks no preference as to the
south branch or its proceeds. It would be impossible to give
the intervener a preference over the mortgage, which was a
first lien, without making such preference effective against all
junior and inferior liens as well. To put it in another way,
the payment of the diverted earnings upon the first mortgage
operated to the benefit of the junior lien holders in that the
first mortgage was thereby reduced in amount. The effect of
the preference now awarded is only to restore the *status quo*
to all parties.

It is our conclusion that the equitable rule under consid-
eration would entitle the intervener to a preference to the ex-
tent of $2,025, with interest from the date of filing its peti-
tion. The decree below will be modified accordingly.

*Modified* and *Affirmed.*