CENTRAL TRUST CO. OF ILLINOIS v. CHICAGO, A. & N. RY. CO.
(ILLINOIS CENT. R. CO., Intervener).

(District Court, N. D. Iowa, E. D. April 3, 1916.)

No. 7.

1. RECEIVERS ⬩152—CLAIMS ENTITLED TO PREFERENCE—TRUST FUNDS.

A sum due from one railroad company to another for traffic balances on interchange of business on account of items omitted from its reports to the other company, and which sum was retained and used in the operation and maintenance of its road, cannot be recovered from its receiver as a trust fund, to take precedence over its bonded indebtedness, where it cannot be traced into any specific property.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 272–275, 278; Dec. Dig. ⬩152.]

2. RECEIVERS ⬩152—INSOLVENT RAILROAD COMPANY—CLAIMS ENTITLED TO PREFERENCE.

Where, however, the bondholders were in control of and operating the road when such sums were withheld, and they were necessary and used to keep the road in safe operating condition, the claim therefor is entitled to preference over the indebtedness to the bondholders.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 272–275, 278; Dec. Dig. ⬩152.]

3. RECEIVERS ⬩152—CLAIMS ENTITLED TO PREFERENCE—OPERATING EXPENSES OF RAILROAD.

The rule usually applied, limiting preferential claims against the receiver of an insolvent railroad company for operating expenses to those arising within six months prior to the receivership, is not arbitrary, but the giving of such preference rests in the discretion of the court.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 272–275, 278; Dec. Dig. ⬩152.]

In Equity. Suit by the Central Trust Company of Illinois against the Chicago, Anamosa & Northern Railway Company. On intervening petition of Illinois Central Railroad Company. Decree for intervener.

Charles L. Powell, of Chicago, Ill., and Glenn Brown, of Dubuque, Iowa, for complainant.

Walter S. Horton, of Chicago, Ill., and Helsell & Helsell, of Ft. Dodge, Iowa, for intervener.

REED, District Judge. This suit is by the complainant, an Illinois corporation, to foreclose two certain mortgages or trust deeds

---

made by the defendant railway company, an Iowa corporation, upon its railroad property in Iowa and the income thereof, to the complainant, December 1, 1904, and April 7, 1913, both of which mortgages are to secure the payment of 350 interest-bearing bonds of said railway company for $1,000 each, dated December 1, 1904, which mortgages were duly recorded in the proper records.

The bill was filed February 21, 1914, and it is alleged therein that the defendant had defaulted in the payment of the principal and interest upon said bonds, except the interest falling due December 1, 1913, and that the railway company is insolvent. Application is made in the bill for the appointment of a receiver, and in an answer filed by the defendant with the bill its allegations are admitted, and consent is given to the appointment of a receiver, and G. E. Farmer, who was then superintendent and manager of the defendant's railroad was appointed receiver of the railroad property.

In March, 1914, the Illinois Central Railroad Company, whose railroad in Iowa is crossed by that of the defendant company at Coggon, in that state, and there connects with that road, filed its petition of intervention, claiming that it is entitled, for various alleged reasons, to priority in payment of some $12,300 from the property of the defendant railway company in the custody of the receiver, alleged to be due the intervener for traffic balances upon interline freight, per diem accounts, and other indebtedness arising out of the exchange of business between the two railroads as connecting carriers, since the fall of 1911, to the time of the appointment of the receiver, and asks that said amount be allowed and paid to the intervener from the property of the defendant in the custody of the receiver, prior to the payment of the claims of the bondholders secured by the mortgages in suit. The defendant and complainant separately answered the intervener's petition, denying its right to priority of payment of its indebtedness in preference to the claims of the bondholders, but not denying the indebtedness claimed, except certain items thereof, which are disputed. Upon the issues so formed a large amount of testimony has been taken, from which and the admissions of the pleadings the ultimate facts deemed material are found to be substantially as follows:

The defendant Chicago, Anamosa & Northern Railway Company (hereinafter called the Anamosa Company) was incorporated under the laws of Iowa prior to 1904, by Peter Kiene, Henry Kiene, and Paul Keine, of Dubuque, Iowa, and others, for the purpose of building and equipping a standard gauge steam railroad from Anamosa, in Jones county, Iowa, in a northwesterly direction to some other point in that state, or beyond, as it might later be determined. To aid in the construction of such railroad the Anamosa Company originally issued $150,000 of its authorized capital stock and $350,000 of interest-bearing bonds, dated December 1, 1904, due in 15 years, interest payable semiannually on the 1st days of June and December in each year following until fully paid, which bonds were secured by the mortgage or trust deed of December 1, 1904, first mentioned in the bill of complaint. With the money derived from the issue of such

stock and bonds the Anamosa Company completed its road prior to 1906 from Anamosa to Coggon, in Linn county, Iowa, some 20 miles from Anamosa, where it crosses and connects with the road of the intervener. In August, 1911, for the purpose of paying a balance owing for building the road to Coggon, and to extend the same beyond that place, the Anamosa Company authorized an increase of its capital stock to $1,500,000 and a new issue of interest-bearing bonds in the same amount, to be secured by the mortgage or trust deed mentioned in the bill upon its railroad property from Anamosa to Coggon, and the extension thereof to Quasqueton, in Buchanan county, 15 miles from Coggon. The company then issued $450,-000 of additional stock, increasing the total amount of stock to $600,-000. From the new issue of bonds so authorized, when issued, the bonds of December 1, 1904, were to be paid, and the remainder were to be sold or otherwise used to complete the road to Quasqueton or beyond; but none of the new issue of bonds so authorized was ever issued. After the increase of the capital stock, and the authorized issue of new bonds, Louis E. Meyer and George B. Caldwell entered into a written contract with Peter Kiene, Henry Kiene, and Paul Kiene, three of the five authorized directors of the Anamosa Company, to loan to that company $250,000, the estimated cost of extending its road from Coggon to Quasqueton, for which notes of the Anamosa Company were to be made in amounts advanced by Myers and Caldwell as needed for building the extension of the road, to be secured by a pledge of the $600,000 of stock and of the $350,000 of bonds dated December 1, 1904. Myers and Caldwell then formed a syndicate, so called (not incorporated), as agreed with the Kienes, to furnish said loan of $250,000.

After so arranging for such loan the Anamosa Company entered into a contract with the L. E. Myers Company, a construction corporation of which the said Louis E. Myers was president, to construct the road from Coggon to Quasqueton. That company did build the road to Quasqueton, and the $250,000 loan to the Anamosa Company was advanced by Myers and Caldwell, "managers of the syndicate," from time to time, to the "L. E. Myers Company," as the building of the road progressed, upon certificates of Henry Kiene, the then president of the Anamosa Company, and notes of that company, indorsed by the Kienes, were made to Myers and Caldwell, "managers of the syndicate," for the loan of $250,000 to the Anamosa Company, and the $600,000 of stock, and the $350,000 of bonds of December 1, 1904, were then pledged and delivered to Myers and Caldwell as security for said loan.

The L. E. Myers Company, a corporation, of which L. E. Myers is or was president, and the builder of the road from Coggon to Quasqueton, has no connection, it is claimed by Myers, with Myers and Caldwell as managers of the "syndicate"; but who were the members of said "L. E. Myers Company," if any, other than Louis E. Myers, its president, does not appear from the testimony. The construction of the road from Coggon to Quasqueton was begun in September, 1911, and in the building thereof differences of some sort

arose between Myers and Caldwell and the Kienes over its construction, or the management thereof, as a result of which the Kienes, who then were three of the five directors of the Anamosa Company, and a majority thereof, retired from such directorate, and Louis E. Myers, George B. Caldwell, and others, acting with them and in their interests, were elected directors of the Anamosa Company, and constituted a majority thereof. Mr. Myers was then elected vice president, and latter chosen president, of the railway company. The extension of the road from Coggon to Quasqueton was completed during the year 1912, and it developed in the fall of that year that the Kienes were then insolvent.

After the Kienes retired from the control and operation of the Anamosa road, Myers and Caldwell, as "managers of the syndicate," being then in control of the board of directors of the Anamosa Company, and holders of the stock and the $350,000 of bonds of that company so pledged to them, took possession of all of the railroad property of that company, as it was agreed in the contract for the loan they might do, and through its agents and employés managed and operated the road, received the income thereof, and also the traffic balances, per diem accounts, and other items of indebtedness owing to the intervener for its share of the carriage of the interline traffic to and from its road as a connecting carrier. Of the earnings of the Anamosa Company while Myers and Caldwell were so in possession and control of the road, also the traffic balances and per diem accounts due to the intervener, which were received, the earnings of both companies were applied to the payment of the improvement of the roadbed, bridges, railroad tracks, and other structures of the Anamosa road to keep it in a safe condition to be operated, and to protect the business of the Anamosa Company, and such improvements were an ordinary current expense of operation, necessary to keep the road in an operative condition, and enable it to perform its duties to the public.

April 7, 1913, Louis E. Myers and those associated with him still being in control of the board of directors of the Anamosa Company, and Mr. Myers its president, that company made to the complainant the second mortgage or trust deed set out in the bill of complaint, upon all of the property of that company from Anamosa to Quasqueton, to further secure the $350,000 of the bonds so pledged to Myers and Caldwell as security for said loan of $250,000. Who the members of the so-called syndicate are, or were, does not appear from the testimony; but, whoever they are or were, Myers and Caldwell acted for them in all these transactions.

In the fall of 1913, Louis E. Myers and George B. Caldwell, in their own names, and not as managers of "the syndicate," brought suit in this court to foreclose their lien upon the stock and bonds of the Anamosa Company so pledged to them as security for said loan of $250,000, and such proceedings were had therein that in December, 1913, they recovered a decree against the Anamosa Company, foreclosing their lien upon said stock and bonds for the amount due upon said loan of $250,000, which, with interest, was then about $250,000,

and an order directing the sale thereof, but no personal judgment against the Anamosa Company. Under such decree the said stock and bonds were sold by a special master of this court to Myers and Caldwell for the amount claimed by them to be due upon said notes, turning in said notes as payment of their said purchase, which sale was duly confirmed in January, 1914.

This suit was then brought by the complainant February 21, 1914, as before stated, to foreclose the mortgages of December 1, 1904, and April 7, 1913. Mr. Farmer, the receiver, who was superintendent in charge of the Anamosa Company while it was in control of and being operated by Myers and Caldwell, testified that, in reporting to the intervener from time to time the amount of its traffic balances, he withheld from such reports a considerable part of the amount so earned by the intervener, but denies any intentional wrong in so doing, and said it was done because the earnings of the road, aside from such traffic balances, were insufficient to pay the necessary operating expenses of the road, and that he retained and so used such traffic balances to keep the railroad property in a safe condition to be operated and protect the business of the road, and that if he had not done so the operation of the road could not have been continued. He also testified that approximately 70 per cent. of the earnings of the Anamosa road, while he was managing the same prior to the appointment of the receiver, came from interline freight, and other traffic carried to and from that road by its connecting carriers, and that approximately 40 per cent. of its entire earnings were carried by the intervener alone; that, if he had been required to make junction settlements with said connecting carriers, he could not have continued the road in operation. During the taking of the testimony the parties stipulated the following facts:

(1) That the bonds of the Anamosa Company, secured by the trust deed and supplement thereto to the complainant, are dated December 1, 1904, and the amount outstanding of said bonds, exclusive of interest, is $350,000, no part of which has been paid; that the trust deed of said defendant railway company to the complainant, securing said bonds and now being foreclosed in this proceeding, is dated December 1, 1904, and was duly recorded in that month, and covers all of the property of every kind of the defendant railway company, and all subsequently acquired property, and the supplemental trust deed of said defendant railway company to said complainant, given to further secure the holders of said bonds, was made and recorded in April, 1913, and said trust deeds cover all the property of defendant railway company of every kind in possession of the receiver herein.

(2) That the complainant's bill was filed, and the receiver appointed and took possession of all the property of the said defendant railway company, February 21, 1914.

(3) That both the defendant Anamosa Company and the intervener the Illinois Central Railroad Company were, at all times when the transactions were had out of which the indebtedness hereinafter mentioned arose, engaged in the operation of lines of railroad, and each of them were common carriers of freight and passengers.

(4) That the railway lines of the intervener Illinois Central Railroad Company and the defendant Anamosa Railway Company cross at Coggon, Iowa, at which point there is a junction and track connection between said two lines.

(5) That in the carrying on of their business it has been and was customary for each of said railroads to deliver to the other at said junction point freight in carload and in less than carload lots, destined to points on or reached through the line of the receiving company, the freight charges, when not prepaid, to be collected at the point of destination by the company making final delivery to the consignee, such freight so collected to be apportioned between the various carriers in the respective amounts to which each carrier was entitled thereto, and payment made therefor by the carrier collecting the freight charges; such items being hereinafter referred to as "interline freight accounts." That since the 1st day of March, 1912, the division of freight between the Anamosa Company and the Illinois Central Company has been that said first-named party received 25 per cent. and the Illinois Central Company received 75 per cent. of the freight charged; but in making this stipulation it is understood and agreed that neither the complainant nor the Anamosa Company in this court, or any other court, in this or any other proceeding, bind themselves to any admission that said division, 25 per cent. and 75 per cent., is a fair or equitable division between said roads of interline freight receipts.

(6) That in carrying on the business it has been, and was, customary for each road to charge to and receive from the other compensation at an agreed price per day for the use of its freight cars while on the line of the other road; such items being hereinafter referred to as "per diem accounts."

(7) That in the carrying on of said business and the interchange of business between the roads there were various bills of one against the other, resulting from work done by one for the other, or from articles furnished by one to the other, or for loss or damage claims, paid by one and chargeable to the other, such items being hereafter referred to as "bills for collection unpaid," and there were some other transactions between the companies, the items of which, hereinafter set out, show for themselves what they were.

(8) That in order to avoid the taking of evidence and accounting on the various claims set out in the petition of intervention, and amendment thereto, the parties hereto have agreed, and do hereby agree, that (figuring the division of interline freight on the basis of 25 per cent. and 75 per cent.) there was at the time of the appointment of the receiver herein, and still is, due to the intervener from the defendant Anamosa Company the various items as hereinafter set out under the head of "interline freight accounts," "per diem accounts," "bills for collection unpaid," "freight charges on contractor's outfit," "claim authorized," and "for account Y. & M. V. R. R. Company," all aggregating the sum of $11,675.64, less the credits shown in the sum of $35.43 due from intervener to said Anamosa Company, making the net balance due to the intervener the sum of $11,640.21.   That

the various items of said indebtedness and of said credits arose and occurred at the various dates as shown in said tables, to wit:

### On Interline Freight Accounts.

| | |
|---|---:|
| From June, 1910, to June, 1913, inclusive, correction items........ $ | 494.82 |
| From September, 1913, to February 21, 1914, correction items...... | 67.65 |
| Regular items. .........................................:....... | 9,406.81 |
|    Total ............................................... $ | 9,969.28 |

### On Per Diem Accounts.

| | |
|---|---:|
| From August, 1911, to July, 1913, inclusive.....'.................. $ | 329.75 |
| From August, 1913, to February 21, 1914, inclusive................ | 468.45 |

### On Bills for Collection Unpaid.

| | | |
|---|---:|---:|
| Total amount ..:........................................ | $243.78 | |
| Freight charges on contractor's outfit for months of August, September, and October, 1911.......................... | 647.45 | |
| Claim authorized for December, 1913, but unpaid.......... | 1.62 | |
| Yazoo & Mississippi Valley Railroad Company, for April, 1913 ...................................................... | 9.60 | |
| Correction claim, August 1913........................... | 5.71 | 908.16 |
|    Total ............................................. | | $11,675.64 |
| (9) Less amount due from the Illinois Central Company to the Anamosa Company .......................................... | | 35.43 |
| Balance due the intervener from the Anamosa Company...... | | $11,640.21 |

Of this amount $52.75 accrued before Myers and Caldwell took possession and assumed control of the Anamosa road, and should be deducted therefrom, leaving as the actual balance due and owing to the intervener the sum of $11,584.46. Other matters deemed material may be noticed in the course of the opinion.

[1] In behalf of the intervener it is urged that the Anamosa Company, in withholding from its reports to the intervener of the amount of the interline freight and other items of indebtedness due the intervener growing out of the interchange of business between the two roads as connecting carriers, and applying the same to the improvement and betterment of its road, track, and structures, to keep them in a safe condition of operation, was such fraud upon the intervener as makes its share of the earnings so retained and applied a trust fund traceable to the property of the Anamosa Company in the hands of the receiver, from which it is entitled to receive payment of such funds in preference to the claims of the bondholders. Admitting, without deciding, that the retention and application by the Anamosa Company of the indebtedness so due the intervener was in fact such fraud upon the latter as would make its share of the earnings a trust fund in the hands of the Anamosa Company as claimed, the question remains: Has such fund been sufficiently traced into the property in the custody of the receiver? It may be conceded, admitting the facts to be as claimed by the intervener, that many cases may be cited in support of its contention, among them Independent District v. King, 80 Iowa, 497, 45 N. W. 908; Davenport Plow Company v. Lamp, 80 Iowa, 772, 45 N. W. 1049, 20 Am. St. Rep. 442; District Township v. Farmers'

Bank, 88 Iowa, 194, 55 N. W. 342; Peak v. Ellicott, 30 Kan. 156, 1 Pac. 499, 46 Am. Rep. 90; McLeod v. Evans, 66 Wis. 401, 28 N. W. 173, 214, 57 Am. Rep. 287; Bircher v. Walther, 163 Mo. 461, 63 S. W. 691. But there has been some modification of these cases in later decisions, in Iowa and Wisconsin, at least. See Jones v. Chesebrough, 105 Iowa, 303, 75 N. W. 97; Bradley v. Chesebrough, 111 Iowa, 126, 82 N. W. 472; Nonotuck Silk Co. v. Flanders, 87 Wis. 237, 58 N. W. 383. Whatever may be the rule in Iowa or other state courts upon this question, the rule for which intervener contends is not generally held in the federal courts. See note to Lowe v. Jones, 7 Ann. Cas. 553, 558.

In Empire State Surety Co. v. Carroll County, 194 Fed. 593, at page 604, 114 C. C. A. 435, at page 446, the Circuit Court of Appeals for this circuit, upon a full consideration and citation of authorities upon this question, said:

"It is indispensable to the maintenance by a cestui que trust of a claim to preferential payment by [an assignee or] receiver out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund, or into a specific identified piece of property, which came to the hands of the receiver, and then the claim can be sustained to that fund or property only and only to the extent that the trust property or its proceeds went into it. It is not sufficient to prove that the trust property or its proceeds went into the general assets of the insolvent estate and increased the amount and the value thereof which came to the hands of the receiver [citing many authorities]."

See, also, Macy v. Roedenbeck, 227 Fed. 346, —— C. C. A. ——.

There is no sufficient testimony that the traffic balances due the intervener from the Anamosa Company have been traced into certain identified property in the hands of the receiver, unless it be the tracks or roadbed and some of the bridges for the improvement and betterment of which the balances were used; but the parts of the roadbed or track and bridges so improved and the extent or value of the improvement has not been definitely shown. The above cases are, of course, controlling upon this court, and put the question at rest here. The contention of the intervener in this regard cannot, therefore, be upheld.

[2] For the complainant it is earnestly insisted by its counsel that the case of Chicago & Alton Railroad Co. v. United States & Mexican Trust Co., 225 Fed. 941, 141 C. C. A. 64 (8th C. C. A.), is applicable to the facts upon the other contention of the intervener, and controls its determination by this court. It is true that in that case it is held that it is only when current gross income of a railroad property in active operation has been diverted from the payment of the necessary current expenses of operation and applied to the payment of interest on the bonded or other secured indebtedness of the road, or upon claims for construction or for improvements and betterments of the property not necessary to keep the road in an operative condition, and leaves unpaid ordinary current expenses necessary to keep the road in a safe condition to be operated, that the court administering the property through a receiver may order the payment of such unpaid expenses from the proceeds of the property, in preference to the pay-

ment of prior recorded liens thereon; but, if there has been no diversion of current income, there can be no restoration, and the amount of the restoration cannot exceed the amount of the diversion. But this is said of facts wholly unlike the case before us; for here Myers and Caldwell, as managers of the "syndicate" and the holders and equitable owners of the entire bonded indebtedness of the Anamosa Company secured by the mortgages in suit, and in control of the board of directors, had taken actual possession of the entire railroad property in question, from Anamosa to Quasqueton, shortly after they made said loan, and thereafter operated the same and received the income thereof up to the time of the appointment of the receiver, and used the amounts so due the intervener for the improvement and betterment of the road, to keep it in a fit and safe condition to be operated, and refused to pay the intervener for its share of the interline traffic. Though there may have been no diversion by the Anamosa Company of its own current income during the time Myers and Caldwell were so operating the road, it is not disputed that it did during such time receive and use the intervener's share of its earnings and appropriate the same to the improvement and betterment of the Anamosa road to keep it in a safe condition for operation.

In Illinois Trust & Savings Bank v. Doud, 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481, the Court of Appeals for this circuit, reviewing with much care the decisions of the Supreme Court of the United States upon the question of the right of an unsecured creditor of a railroad corporation to a preference in payment of his claim out of the net income, or the corpus of the property, over creditors secured by recorded liens thereon, deduced therefrom the following, among other, conclusions, viz.:

"A court of equity, engaged in administering mortgaged railroad property under a receivership in a foreclosure suit, may prefer unpaid claims for [necessary] current expenses of the * * * operation of the railroad, incurred within a limited time before the receivership, to a prior mortgage lien in the distribution of the [net] income, or of the proceeds of the mortgaged property."

This rule was reaffirmed in Rodger Ballast Car Co. v. Omaha, K. C. & E. R. R. Co., 154 Fed. 629, 83 C. C. A. 403, and other cases. It is true that it is said in the Rodger Ballast Car Company Case, and in the Chicago & Alton Railroad Company Case above, that the rule of the earlier cases in the Supreme Court has been narrowed by the decision in Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717. But in none of these cases has it been denied that the ordinary current expenses of operation necessary to keep the road in a safe condition to be operated and protect the business of the road may be paid from the corpus of the property when the income thereof is insufficient to pay such expense in preference to prior recorded liens thereon. Miltenberger v. Logansport Ry. Co., 106 U. S. 286, 311, 1 Sup. Ct. 140, 27 L. Ed. 117. And see Shugart & Barnes Bros. v. A., N. & S. Ry. Co., 161 Iowa, 351, 361, 143 N. W. 90. And see Love v. North American Surety Co., 229 Fed. 103, —— C. C. A. ——.

No authority has been cited or principle of equity suggested by counsel for the complainant that will permit the bondholders of an insolvent

railroad company who are themselves in possession of its property, operating the road and receiving the earnings of connecting carriers, as was done in this case, to defeat recovery by connecting carriers of such earnings by a foreclosure and sale of the mortgaged property securing the bonds.

The complainant urges, however, that Myers and Caldwell, as managers of the syndicate, held the stock and bonds of the Anamosa Company only as a pledge or security, and acquired the legal title in January, 1914, when they purchased them at the master's sale under the decree of foreclosure and surrendered the notes of the Anamosa Company in payment of such purchase. But this is a matter of form only, and not of substance, for the pledge of the bonds and stock to them as security is as effectual to protect them in their actual right to the pledge as if they had been the holders of the legal title thereto; and a court of equity will so construe the transaction, if necessary, to protect the rights of others in the proceeds of the property, especially when the share of the earnings of the intervener has been so used as to inure to the benefit of Myers and Caldwell as effectually as if they had been the holders of the legal title of the pledge. Who the members of the syndicate, other than Myers and Caldwell, are or were, does not appear from the testimony; but, whoever they are or were, Myers and Caldwell were acting for them in all of these transactions, and they are bound by such action. The conclusion, therefore, is that the intervener is entitled to an order or decree directing the receiver to pay from the proceeds of the railroad property in his custody, its claim against the Anamosa Company accruing from the time Myers and Caldwell took possession of the railroad property to the appointment of the receiver on February 21, 1914, in preference to the claims of Myers and Caldwell as holders of the bonds of the railroad company.

[3] The fact that some of the items stipulated as due to the intervener accrued more than six months prior to the appointment of the receiver has not been overlooked. Such limit, however, is not arbitrarily fixed, but rests in the discretion of the court; and when the bondholders are themselves in possession of and operating the road, or some other circumstances so warrant, the rule ought not to be followed. The amount the intervener is entitled to recover in this case was not a voluntary loan or advancement to the Anamosa Company, but was an appropriation by that company, while the road was in control of the bondholders, of the earnings of the intervener as a connecting carrier to the payment of the necessary and ordinary expenses of operation during the entire time they were operating the road. The bondholders, and the complainant who brings this suit for their benefit, are therefore estopped from denying the equitable right of the intervener to be paid in full from the corpus of the property the amount of its earnings so applied in preference to the payment of the bonds.

The intervener, by an amendment to its petition, asks that the receiver be required to install an interlocking switch or crossing of the two roads at Coggon as a necessity for the safe use of the crossing by each of the roads, and that it be done at the expense of the receiver as agreed between the two companies prior to the receiver-

ship. There has been no testimony called to the attention of the court in regard to this matter. The condition of the road is such that the matter will not now be considered, but will be left until the final settlement of the receivership.

The intervener has also filed an amendment or supplemental petition of intervention, in which it asks that the receiver be required to pay the traffic balances due to the intervener and received during his operation of the road, and has failed to pay to the intervener. Traffic balances due the intervener and collected by the receiver during his administration of the road, and not accounted for to the intervener, are expenses of administration, that will be included in the final settlement of the receiver's accounts.

A decree may be prepared by counsel of the respective parties in accordance with the views herein indicated, which shall provide for the sale of the property in the custody of the receiver, and submit the same to the court for approval. It is accordingly so ordered.